## ANDERSON FURNITURE CO.
### v. RODEN et al.
#### No. 6253.

Court of Civil Appeals of Texas.
Amarillo.

Nov. 10, 1952.

Rehearing Denied Dec. 1, 1952.

---

Bane & Bane, Dallas, for appellant.

Carter, Gallagher & Barker; Thompson, Coe & McCord; Carrington, Gowan, Johnson & Walker, all of Dallas, for appellee.

PITTS, Chief Justice.

Appellees, Homer A. Roden and E. E. Manning, instituted this suit in July of 1950 against appellant, Anderson Furniture Company, for property damages caused about noon on April 15, 1950, by reason of a fire which destroyed a duplex residence and the contents therein in Dallas County and which resulted from the alleged negligence of appellant's employees. In addition to the alleged actual damages by reason of the fire to the duplex owned by appellee Manning and the alleged loss of certain household goods and personal effects owned by appellee Roden, both appellees sought exemplary damages by reason of alleged gross negligence of appellant's agents in their attempt to install a cooking range stove in the duplex without first cutting off the flow of natural gas.

Appellant answered by joining issues with appellees but thereafter filed an amended answer claiming full settlement of the losses sustained by appellees with their respective insurance companies, Mercury Insurance Company and Fireman's Fund Insurance Company, which companies, it alleged, had on June 15, 1950, executed releases relieving appellant of any further liability as a result of the fire in question. Appellees then impleaded the said insurance companies and their general agents and admitted the said companies had certain subrogation rights but charged that they had no authority to execute releases covering appellees' uninsured losses. Appellees, respectively, sought recoveries against the said insurance companies respectively, if the said companies had exceeded their subrogation authority in executing releases to appellant covering uninsured losses. The insurance companies answered and admitted they had paid appellees, respectively, for the losses sustained only to the extent of the respective sums the respective policies indemnified appellees against losses and had settled with appellant for such limited subrogation sums only but had not settled with appellant for any uninsured losses claimed by appellees. They further pleaded, in effect, that appellant's agents knew at the time of the settlements that such were made only for the subrogation claims and did not include additional claims being then made by appellees against appellant for uninsured losses sustained by appellees. This pleading put in issue the question of knowledge and intentions of the parties. Nowhere did appellant plead any grounds of recovery over and against the insurance companies.

The case was tried to a jury. At the close of the evidence the trial court instructed a verdict in favor of the insurance companies and their general agents, but submitted to a jury the issues raised by appellees against appellant. In connection with such instructed verdict the trial court found that appellant had not pleaded any grounds of recovery against the insurance companies. Based upon findings of the jury in answer to special issues, the trial court rendered judgment for both ordinary damages and exemplary damages against appellant, Anderson Furniture Company, and for each appellee, from which judgment the said appellant has perfected its appeal. In order to equalize the dockets of the Courts of Civil Appeals, the Supreme Court has transferred this case from the Dallas Court of Civil Appeals to this court.

Appellant has predicated its appeal upon 38 points of error but has grouped some of them for presentation. All points are

being considered by us, but we do not deem it necessary to discuss them numerically and separately.

The merits of the issues presented concerning liability of the insurance companies and appellant's liability for uninsured losses, if any, sustained by appellees depend upon the terms of two settlement agreements made by a representative of the insurance companies and appellant's agent as well as upon a proper construction of certain releases executed to appellant by the respective insurance companies, together with parol evidence showing circumstances out of which their execution grew and those surrounding their adoption as well as the relationship of the parties thereto as is authorized in such matters by the Commission of Appeals in the case of Ryan v. Kent, 36 S.W.2d 1007, and numerous other authorities. Before considering such releases may we observe that appellant seeks to have us consider the contents of certain loan receipts, introduced in evidence over objections, executed by appellees, respectively, acknowledging payments, respectively, by the insurance companies of the indemnifying sums, respectively, set out in the policies and the subrogation rights given by appellees, respectively, to the insurance companies, respectively, against appellant for the said sums. The record and the releases themselves reveal that the insurance companies in making the settlements exercised the authority given them under the terms of the policies and not the loan receipts. However, appellant seeks to make these loan receipts a part of the basis for its settlements in full of the claims in question. The evidence reveals conclusively, however, that appellant was in no way a party to the said loan receipts; that its agents knew nothing about their execution or existence until some seven months after the insurance companies had settled their subrogation rights with appellant and issued the releases therefor; that neither the contents of such loan receipts or their existence was known to appellant's agents who settled the subrogation claims with the insurance companies at the time such settlements were made and the loan receipts and their contents therefore had no influence or bearing upon appellant or its agents in making the subrogation settlements. Neither did the contents of the loan receipts have any influence or bearing upon the agent of the insurance companies who made the settlements for them. Such facts having been conclusively established, the contents of the loan receipts are therefore wholly immaterial as to the issues here presented. Such is particularly true in view of the testimony of the witnesses who made the settlements as hereinafter set out.

The record reveals that appellees had employed Honorable Guy Carter's firm of attorneys to represent them in connection with their claims for fire losses sustained; that the insurance companies had employed Honorable J. Alex Blakeley as their attorney and representative to present their subrogation claims against appellant and to represent them in the matter; and that appellant had employed Honorable W. F. Bane & Son, as attorneys to represent it concerning claims of liability made against it for the fire losses in question. These facts were soon thereafter known among all of the said attorneys. The record further reveals that both Carter and Blakeley began negotiations immediately thereafter with Bane & Bane concerning settlements of their respective claims as a result of the fire. Such negotiations were being made both orally and by letters. Carter wrote appellant a letter concerning appellees' claims of date April 19, 1950, and the said letter was turned over to W. F. Bane by appellant. The record also reveals that the Mercury Insurance Company had on April 19, 1950, paid to appellee Homer A. Roden the sum of $2000, the amount of indemnity to protect household goods against fire specified in the policy previously issued by it to Roden, had accepted from Roden a subrogation right for the said amount and had then assigned the said subrogation right or claim for the said amount to Alex Blakeley for collection from appellant. Fireman's Fund Insurance Company had on April 27, 1950, paid to appellee E. E. Manning the sum of $5200, the amount of indemnity to protect the house against fire specified in the policy previously issued by it to Man-

ning, had accepted from Manning a subrogation right and had then turned the subrogation right for only $5200 over to Alex Blakeley for collection from appellant. Soon thereafter on May 4, 1950, Alex Blakeley, having both subrogation claims to collect from appellant, but having no authority to represent appellees in any way, began negotiations with appellant by writting the following letter (formal parts omitted):

"We represent the Mercury Insurance Company and the Fireman's Fund Insurance Company in connection with claims against you under their subrogation rights under their policies of insurance covering household goods owned by E. E. Manning and Mrs. Homer Anderson Roden and the premises occupied by them located at 4808 Cole Avenue. The total loss amounts to approximately $9,000.

"Our investigation of the facts and circumstances surrounding the loss indicates that it was the result of the negligence of your agent and, therefore, we are looking to you for reimbursement of our client's outlay.

"We shall be glad to discuss the matter with your representative at his convenience."

Appellant received the letter and passed it on to its attorney, Honorable W. F. Bane, who represented appellant in negotiating and settling the two subrogation claims with Alex Blakeley, which settlements were consummated on June 15, 1950. Except for the two letters referred to, all negotiations that resulted in the settlements were oral. F. M. Boyd, Treasurer and Director of Anderson Furniture Company, drew the draft for settlements, payable to Blakeley, Attorney for Insurance Companies but Boyd had nothing to do with the settlements. W. F. Bane delivered the draft to Blakeley and accepted the releases from Blakeley. Blakeley collected his fee for services from appellants through Bane for a sum over and above the subrogations claims.

The releases executed to appellant by the two insurance companies are identical in substance except as to the indemnity amounts, the dates of the policies issued, the descriptions of properties covered, and the names of the parties. Since the material terms of the two instruments presented for construction are the same, only one of the releases will be here copied in full as follows:

"State of Texas }
"County of Dallas }

"Whereas, heretofore, to-wit, on the 15th day of April, 1950, at about the hour of 12:15 P. M., that certain duplex dwelling owned by Emory E. Manning and wife, Mary Oneta Manning, located at 4808–10 Cole Avenue in the City of Dallas, Dallas County, Texas, was damaged by fire, and

"Whereas, at the time and on the occasion of said fire, said dwelling was insured under a policy of insurance issued to the said Emory E. Manning and wife, Mary Oneta Manning by the Fireman's Fund Insurance Company, said policy bearing number 306165 with inception date of July 12, 1949, and expiration date of July 12, 1952, and

"Whereas, under and by virtue of the terms of said policy of insurance, the said Fireman's Fund Insurance Company became bound and obligated to pay unto the said Emory E. Manning and wife, Mary Oneta Manning, the sum of Five Thousand Two Hundred and no/100 ($5,200.00) Dollars and did, on or about the 27th day of April, 1950, pay said sum unto the said Emory E. Manning and wife, Mary Oneta Manning, in full and final discharge of its liability under said policy of insurance, and

"Whereas, under and by virtue of the terms of said policy of insurance, the said Fireman's Fund Insurance Company became subrogated to the rights of the said Emory E. Manning and wife, Mary Oneta Manning against any and all parties responsible for the damage of said duplex dwelling, and

"Whereas, it is the contention of the Fireman's Fund Insurance Company that the said damage to said dwelling

was caused by the negligence of Anderson Furniture Company, by virtue whereof, the said Fireman's Fund Insurance Company under its subrogation rights afforded by said policy of insurance, has asserted a claim against Anderson Furniture Company for payment of all loss and damage to said dwelling and has demanded of the said Anderson Furniture Company the sum of Five Thousand Two Hundred and no/100 ($5,200.00) Dollars in payment and satisfaction of its claim against the said Anderson Furniture Company, and

"Whereas, the said Anderson Furniture Company disclaims any and all liability of any nature whatsoever for the damage to said dwelling and contends that the claimed loss and damage was not occasioned by any act or conduct on the part of Anderson Furniture Company and denies that the said dwelling was, in fact, damaged or that the said Emory E. Manning and wife, Mary Oneta Manning suffered the loss and damages claimed to have been suffered by them and further denies that it is in any wise responsible to any person, firm or corporation to any extent whatsoever in any sum whatsoever arising out of or occasioned by said fire of April 15, 1950, and

"Whereas, Anderson Furniture Company, without admitting liability but expressly denying any and all liability, and Fireman's Fund Insurance Company, both realizing the expenses, burdens and uncertainties of litigation, are desirous of settling, adjusting and compromising all disputes existing between them by virtue of the premises and, accordingly, have agreed upon a full settlement and compromise of all loss or causes of action that the said Fireman's Fund Insurance Company may have against the said Anderson Furniture Company because of said claimed damages, in order to settle such controversy;

"Now, therefore, for and in consideration of Four Thousand Seven Hundred Sixty One and 32/100 ($4,761.32) Dollars to it in hand paid, the receipt of which is hereby acknowledged, the said Fireman's Fund Insurance Company does hereby release the said Anderson Furniture Company of and from any and all claims, demands, causes of action, damages, suits or costs whatsoever by reason of said occurrence and any and all resulting loss or damage to the dwelling owned by Emory E. Manning and wife, Mary Oneta Manning on the date of said loss.

"In Testimony Whereof, witness our hands this 15th day of June, A.D.1950.

"Fireman's Fund Insurance Company
By Weldon L. Moore
　　　　　　　　Special Agent

Witness:
R. L. Grier
J. J. Wallace"

It is admitted by all parties that the releases are free of ambiguity. By reason of their terms it is the position of appellant that it settled all of appellees' claims for losses in full with their respective insurance companies and that appellees are precluded from asserting against it any cause of action for further damages by reason of the fire losses in question. Appellees and the insurance companies contend that the terms of the said instruments release only the subrogation rights of the insurance companies and do not purport to affect any claims of appellees against appellant for uninsured losses.

■. An instrument such as the releases here in issue must be considered as a whole in order to give effect to its general purpose and the true intention of the parties. Lone Star Gas Co. v. X-Ray Gas Co., 139 Tex. 546, 164 S.W.2d 504. We shall now examine the various pertinent parts of the releases that make up the whole instrument. The second and third paragraphs admit the issuance of the policies to appellees and acknowledge payments under the terms of the policies the amounts therein specified to the assured in full and final discharge of the liability of the insurance companies respectively. The fourth paragraph states that: "under and by virtue of the terms of the policy" the insurance companies "became subrogated to the rights" of appellees "against any and all parties responsible for

the damage and destruction" of the properties insured. The fifth paragraph sets forth the contention made by the insurance companies to the effect that the fire and losses were caused by the negligence of appellant and that the insurance companies under their "subrogation rights afforded by said policy of insurance, has asserted a claim against Anderson Furniture Company", appellant, for payment of the losses and damages sustained by appellees in the amounts of their subrogation claims respectively. In the Mercury Insurance release the demand made was for the sum of $2000, the exact amount paid to the assured under the policy issued as previously shown in the release, while in the Fireman's Fund release the demand was for $5200, the exact amount paid to the assured under the policy as previously shown in the release. The sixth paragraph shows appellant's denial of liability for the losses and damages sustained but the seventh paragraph provides that the parties "are desirous of settling, adjusting and compromising all disputes existing between them by virtue of the premises (meaning according to and under the terms of the subrogation claims previously set out in the release) and, accordingly, have agreed upon a full settlement and compromise of all losses or causes of action that the said (insurance companies) may have against the said (appellant) because of said claimed damages." The eighth paragraph recites the final terms of the settlements made between appellant and the insurance companies for all of the claims and demands made upon appellant by the insurance companies (nobody else was there involved) by reason of the occurrence of the Manning and Roden fire. Settlements were there made in each instance for a little less than the subrogation claims, respectively, amounted to but the releases were given for the full amounts. Nowhere do the insurance companies purport to be representatives of appellees or to release appellant from any uninsured claims made against appellant by appellees. Nowhere do the releases purport to release any 'sums other than the respective subrogation claims.

The releases are evidence of the fact that appellant and the insurance companies had adjusted their previous differences and had previously agreed upon a settlement between them. As will be later herein shown the settlements were made by oral agreement of the agents of the parties and the releases executed accordingly thereafter. According to the record before us the releases are the only written memoranda showing the terms and purposes of the oral settlements made between the parties. Without attempting to change or vary in any way the language used or the terms of the releases, parol evidence was heard to establish the surrounding circumstances, the situation of the parties and the subject matter being there considered. Such may be done in considering matters of this nature although the language used is not ambiguous. Ryan v. Kent, supra; Guardian Trust Co. v. Bauereisen, 132 Tex. 396, 121 S.W.2d 579; Scott v. Walden, 140 Tex. 31, 165 S.W.2d 449, 154 A.L.R. 1; First Nat. Bank of Amarillo v. Rush, Tex.Com.App., 210 S.W. 521; Allison v. Campbell, 117 Tex. 277, 298 S.W. 523; Merchants' Life Ins. Co. v. Griswold, Tex.Com.App., 237 S.W. 232. These authorities further hold that parol evidence is admissible under such circumstances for the purpose of ascertaining the real intention of the parties.

Alex Blakeley, who represented the insurance companies in making the settlements with appellant and who wrote the letter to appellant heretofore set out, testified, in effect, that he talked several times about the claims in question with Mr. Bane, one of appellant's attorneys, who represented appellant in making the settlements, and told Mr. Bane that he (Blakeley) was representing only the insurance companies and that he hoped his subrogation claims for them could be settled without litigation; that he and Mr. Bane discussed the fact that Guy Carter's firm of attorneys represented appellees' claims over and above the insured losses and that Mr. Bane told him about Guy Carter's demands for such losses; that Mr. Bane told him, Blakeley, that he was going to settle with him and fight it out with Guy Carter; that he at all

times during all negotiations told Bane and other agents of appellant that he was representing only the insurance companies and that the settlements being made by him with Mr. Bane acting for appellant were being made for the insured losses only.

Honorable W. F. Bane, one of appellant's attorneys, testified, in effect, that he had talked with Blakeley and had received the letter from him and knew that Blakeley represented the insurance companies and that Blakeley did not represent anything different to him; that all the negotiations for settlements between him and Blakeley were oral and were principally concerning the amount of settlements; that he knew Guy Carter represented appellees and nobody had ever indicated to him that Guy Carter had ceased to represent appellees; that he did not know what the loan receipts, given by appellees to the insurance companies, contained until about February 1, 1951, some seven months after the settlements had been made with Blakeley, and it was then that he amended his petition in this suit claiming full settlement with the insurance companies for all claims; that he thought at the time he delivered the settlement draft and received the releases from Blakeley that such settlements covered only the $2000 and the $5200 set out in the releases and that he knew appellees were making demands for amounts in excess of the insured amounts but he was not sure of the exact amounts of such claims. The testimony of Lee S. Bane corroborated that given by his father.

F. M. Boyd, Treasurer and Director of Anderson Furniture Company, appellant, testified that he knew when he issued the draft for settlement, that he was settling two subrogation claims of insurance companies against appellant, and that such were just subrogation claims that were being settled.

■ An examination of the release from its four corners and the language as a whole used in the releases reveals that an agreement had been reached between appellant and the insurance companies settling only the subrogation claims. They were the only parties to the agreements and nobody else was represented in the settlements.

Therefore, the releases were given in settlement only of the subrogation rights and claims of the insurance companies against the appellant. The instruments could not bestow any benefits or withhold any rights concerning anybody who was not a party to them or not in any way represented in the settlements. Appellees were not parties to the agreed settlement made between the insurance companies and appellant. Neither were they represented there. They were strangers to that contract of settlement, except for the use of their names in the releases for the sole purpose of identifying the losses and subrogation claims as a result thereof that were being settled. Their names were used only to show how the insurance companies acquired the subrogation claims and to further designate or identify the losses sustained. The insurance companies only released appellant from any further liabilities to the insurance companies and only to them. Appellees did not release appellant from liabilities to them. The contents of the releases, together with the contents of the letter introduced in evidence and the testimony of the witnesses Blakeley, W. F. Bane and Boyd who negotiated and consummated the settlements concerning the surrounding circumstances and intention of the parties conclusively establishes the fact that the settlements were intended to be made and were actually made only for the subrogation claims of the insurance companies and not for any part of uninsured claims.

■ Be that as it may, the record reveals that Blakeley and W. F. Bane, who represented the insurance companies and appellant, respectively, did not intend to, and did not in fact, contract to settle any claims other than the subrogated claims, or the insured claims, and not the uninsured claims. Both Blakeley and W. F. Bane so testified, in effect, and such was not controverted. The insurance companies pleaded reformation of the releases, if need be, in the alternative, to make them conform, if need be, to the terms of the oral agreement and the intention of the parties, acting through their respective agents. The pleadings and the evidence concerning this matter were before the court and every legiti-

mate presumption must be indulged in favor of the trial court's judgment. If the trial court's judgment can be sustained upon any reasonable theory consistent with the record, it must be affirmed. Fitzgerald v. Legrande, Tex.Civ.App., 187 S.W.2d 155; Kimball-Krough Pump Co. v. Judd, Tex. Civ.App., 88 S.W.2d 579; Ellerd v. Murray, Tex.Civ.App. 247 S.W. 631; Green v. Cross, 79 Tex. 130, 15 S.W. 220.

For these reasons the trial court was justified in giving an instructed verdict in favor of the insurance companies and their general agents, leaving the fact issues raised by the pleadings of appellees and appellant to be determined by the jury and giving proper credits in the judgment rendered for the subrogation claims found to be true and correct.

It is our opinion that the record reflects that it occurred for the first time to the Banes, appellant's attorneys, to make a contention that the releases were for a full settlement, including the uninsured losses as well as the insured losses, seven months after the settlements had been made and long after suit had been filed by appellees and appellant had answered it on its merits. The thought occurred to the Banes as a result of a trivial remark made by Alex Blakeley to young Lee S. Bane, while they were talking about the case in Blakeley's office on or about February 1. 1951, after Blakeley had made the settlement with W. F. Bane and was out of the case and not representing the insurance companies any further. In discussing the case Blakeley asked young Bane, "Why don't you throw that loan receipt at them?" When young Bane inquired for further information, Blakeley further said, "If you want to give these folks (meaning Mannings and Rodens) some trouble, why don't you plead those releases". However, Blakeley thereafter testified that the releases were not for full settlements and that he did not represent appellees in the settlement and the Banes testified, in effect, that such was their understanding. Nevertheless, young Bane went immediately and told his father what Blakeley had said and Banes amended their petition in this action claiming full settlement of the claims as a defense for the first time seven months after the oral settlements had been made and the releases in question executed.

In answer to special issues submitted, the jury, under instructions of the trial court, awarded appellee Roden $6,130.32 actual damages for loss of personal property and appellee Manning $6,750 actual damages done to the duplex both against appellant because of the negligence of its agents which proximately caused the fire and losses sustained and further awarded each appellee the sum of $2500 against appellant as exemplary damages because of the gross negligence of appellant's agents which resulted in both actual and exemplary damages. After giving proper credits for the subrogation claims previously herein discussed against the actual damages awarded, the trial court entered judgment in accordance with the jury findings.

Appellant charges that the trial court erred in permitting the introduction of a list of lost items of personal property belonging to appellee Roden and the values, respectively, of each item, the same being identical with appellees' Exhibit A attached to their pleadings. It will be noted that appellant does not here challenge the sufficiency of the evidence. The list made by Roden and his wife contains approximately 185 items of alleged lost articles with the values respectively set out opposite each item. They were required to plead the items lost and their respective values before they could recover for the losses sustained. They met such requirement by so pleading. In this instance the goods, except for a badly damaged bedroom suite, were lost by complete destruction. Nobody but the owners would be expected to know much if, in fact, anything about all the items lost or their values. Consequently under such circumstances the courts have uniformly approved more lenient ways and means of establishing the measure of damages than is usually required in most other actions for damages and have been more liberal in permitting the introduction of evidence to sufficiently prove such losses.

In the case at bar Roden and his wife were permitted to testify that the list cor-

rectly reflected the articles lost and the actual values. as well as their values to them. In the case of Interstate Forwarding Co. v. McCabe, Tex.Civ.App., 285 S.W. 920, the court held in a similar action that such a list of articles, together with their respective values, when identified by the owner as being correct, was admissible in evidence without first proving market value of the respective articles or the lack of market value. This court observed the same rules of law in the case of Demeritt v. Bade, Tex.Civ.App., 98 S.W.2d 219. In the case of City of Wichita Falls v. Mauldin, Tex.Civ.App., 23 S.W.2d 771, affirmed, Tex.Com.App., 39 S.W.2d 859, the court observed such rules of law and there held that in order to qualify the owner of such destroyed goods to identify them and to testify as to their value, he need not be required to state the original costs of such goods or their period of use and their condition but he may testify as to their value to him or to the loss of them in money value to him.

■ Under the record and the authorities cited it is our opinion that the list of lost items, together with the values respectively thereof, was properly admitted in evidence by the trial court. In addition to the other authorities already cited we likewise cite the case of Pecos & N. T. Ry. Co. v. Grundy, Tex.Civ.App., 171 S.W. 318, which has since been many times cited with approval.

■ Appellant contends that a proper measure of damages was not submitted to the jury by the trial court but we do not agree with such contention. Such issues were raised by both the pleadings and the evidence. In separate issues the trial court inquired about the reasonable value of property to its owner immediately before the fire and immediately after the fire and the jury findings were based thereon. Under the authorities previously cited we think the measure of damages was correctly submitted but we likewise cite the following additional authorities: American Ry. Express Co. v. Thompson, Tex.Civ.App., 2 S.W.2d 493; Wutke v. Yolton, Tex.Civ. App., 71 S.W.2d 549; Ricks v. Smith, Tex.

Civ.App., 204 S.W.2d 12. The failure to define the term "reasonable value" was not error as claimed by appellant. However, appellant has waived its right to complain about such if it were error since it did not request a definition in writing and furnish a substantially correct definition to the trial court as required by Rule 279, Texas Rules of Civil Procedure.

Appellant charges that the trial court erred in submitting Special Issue number 9 to the jury inquiring if M. E. Martin instructed Jessie Ivie to install the gas stove in question without first turning off the flow of natural gas at the meter. The proof shows that Ivie, an employee of appellant, installed the stove under the direction of Martin, another employee of appellant, and that a gas explosion occurred during the process of installation, causing the fire in question and the losses sustained, as a result of Ivie's failure to cut off the flow of natural gas while installing the stove. The jury found that Martin did instruct Ivie to install the gas stove without turning off the gas at the meter.

May we here observe, however, that, according to the record before us, appellant does not anywhere challenge or complain about the submission of further issues to the jury inquiring if such acts of appellant's agents constituted gross negligence and the amount of damages, if any, to be awarded to appellees, respectively, as exemplary damages because of such gross negligence, if any, of appellant's agents. Neither does appellant challenge or complain about the jury's findings in answer to such issues to the effect that such acts of appellant's agents constituted gross negligence for which reason the jury awarded each appellee $2500 as exemplary damages.

■ In connection with its complaint about the submission of Special Issue No. 9 appellant charges that appellees' pleadings are insufficient and that there was no evidence to support the issue. Appellees pleaded, in effect, and briefly here stated, that Ivie, as agent and servant of appellant, while working under the direction of Martin, a principal or vice principal of appellant, and while in the course of his

employment, negligently caused the fire that resulted in the losses in question. It is our opinion that appellees' pleadings are sufficient to support the said issue. Under the record before us appellees need not do more than support the foregoing pleadings with proper evidence in as much as appellant has not challenged the further findings of the jury concerning gross negligence and exemplary damages.

■ Appellant is in error in charging that "no evidence" was introduced in support of Special Issue No. 9. However, appellees were charged with the burden of introducing sufficient evidence of probative force to establish an affirmative answer to the said issue. In determining the sufficiency of such evidence, we must give credence only to the evidence and circumstances favorable to the jury's answer and disregard all evidence to the contrary. McLean v. McCollum, Tex.Civ.App., 209 S.W.2d 959, and other authorities there cited.

■ Jessie Ivie testified that he worked for appellant under the direct supervision of M. E. Martin from whom he got his instructions; that a portion of his duties were to deliver to the purchaser (appellees) a cooking range stove that had been sold by appellant and connect it up and that M. E. Martin instructed him to connect up for the customer a cook stove such as the one here in question without cutting off the flow of the natural gas at the meter. He further testified that he was following the instructions of Martin on the occasion in question, did not cut off the gas, an explosion occurred that resulted in the fire and the losses sustained. Ivie testified on direct examination that he was so instructed by Martin; he so testified on cross-examination and again on redirect examination. M. E. Martin testified that he did not remember giving Ivie any specific instructions about installing a cooking range but he could have discussed it with him. This evidence is sufficient to sustain the jury finding in answer to Special Issue No. 9 to the effect that Martin instructed Ivie to install the gas cook stove without first turning off the flow of the natural gas at the meter.

■ Assuming that the jury was justified in its affirmative answer to Special Issue No. 9, appellant contends that it must be established also that M. E. Martin was a vice principal of appellant before exemplary damages can be awarded to appellees and we think such contention is sound. The rules of law concerning the liability of a corporation for exemplary damages arising from gross negligence of its agents have been restated by the Supreme Court in the case of Fort Worth Elevators Co. v. Russell, 123 Tex. 128, 70 S.W.2d 397. There the court designated four separate classes of corporate agents either of which is a vice principal of a corporation. Only two of the four classes of corporate agents there set out are of interest to us in determining the issue of vice principal here presented. The court there held in part that the term "vice principal" as applied to an agent of a corporation means (1) one who has authority to employ, direct and discharge servants of the master, or (2) one to whom a master has confided the management of the whole or a department or division of the business.

F. M. Boyd, treasurer of Anderson Furniture Company, appellant, testified, in effect, that M. E. Martin had been one of appellant's employees for the past 18 or 20 years and he was a trusted employee who had been given authority to help operate appellant's business; that prior to the fire in question Martin had been employed as shipping clerk for 5 or 6 years and had supervisory control over the shipping department of the business with 10 or 12 men working under his control and supervision; that appellant had a retail store at 2101–07–09 Elm Street in Dallas and immediately back of the said retail store and opening on Pacific Avenue at 2110 Pacific Avenue was the shipping room over which Martin had supervisory control; that appellant maintains a warehouse at 2226 Griffin Street and operates another retail store at 2222 North Harwood Street; that Martin was charged with the duties of shipping and receiving merchandise for appellant, making

deliveries of local goods sold and he also had authority to direct the men working under him what to do and what not to do; that Jessie Ivie was one of the men working under the direct supervision of Martin who had authority to direct Ivie when and where to make deliveries; that Ivie delivered the stove in question to the premises of appellees; that Martin employed Jessie Ivie but his employment was confirmed by appellant's officers; that Martin had the power to recommend whom he hired and fired.

The testimony of this officer of the corporation was corroborated in the main by the testimony of M. E. Martin, who testified, in effect, that he had been with appellant a long time and had been shipping clerk for 8 or 10 years and was in charge of the shipping department and the warehouse where some merchandise was kept; that the warehouse was separate and apart from the retail store and had a different entrance; that he supervised the shipping department and the warehouse and when furniture was sold, it was a part of his duty to get the same out of the warehouse, prepare it for delivery and have it delivered to the customer; that he directed Jessie Ivie to deliver the stove in question to Roden's home and connect it up; that he had employed Ivie in November of 1949 and he had likewise employed Ivie's helper, Anthol Armstrong; that he had 10 or 12 men working under his supervision and he had authority to tell them where to go and what to do and Ivie and Armstrong were two of them; that most of the time he hired men who came well recommended to them but he sometimes hired a man if he knew the company he worked for and then checked on the man after he hired him; that he got his authority for operating the shipping department and supervising the warehouse directly from Mrs. Grace Anderson, president of the Anderson Furniture Company (appellant), and a member of the Board of Directors; that she told him he was a trusted employee and that the shipping department including the supervision of the warehouse was his department but he always consulted the officials concerning any changes made in his department.

No testimony was offered that even had a tendency to contradict or disprove any of the foregoing testimony. This testimony conclusively establishes that M. E. Martin had been given the management and had been placed in charge of a specific department of appellant's business with 10 or 12 employees working under his supervisory control. This alone conclusively establishes the fact that Martin was a vice principal of appellant in the operation of its business. However, the evidence also conclusively shows that Martin had full authority to direct the work of the employees working under his supervision in his department and he testified without it being contradicted that he hired the employees working under him and had authority to recommend the firing of such men. The record reveals, however, that he never did recommend the firing of any employee and none was ever fired. It is our opinion that the evidence conclusively establishes, under the holdings of the Supreme Court previously cited, that M. E. Martin was the vice principal of appellant as a matter of law. In support of our position we quote further holdings of the Supreme Court in the case previously cited of Fort Worth Elevators Co. v. Russell, supra, as follows [123 Tex. 128, 70 S. W.2d 407]:

"If in an action for actual damages for negligence the vice principal is to be regarded as the alter ego of the corporation, and his acts corporate acts, how can it be said that his grossly negligent acts are not also those of the corporation? If he represents the corporation when *negligent,* whom does he represent when *grossly negligent?* There can be but one logical answer, and that is, *he still represents the corporation;* provided, of course, the work in hand is within the duties delegated to him. Mr. Sedgwick, it seems to us, states the correct general rule, as follows:

" '*A corporation is liable for exemplary damages for its own act, that is, for the act of its directors or other agents whose act is the act of the corporation. Thus gross negligence in hiring servants will subject a corporation to exemplary damages, and so will ex-*

*press authorization or ratification of the servant's acts.'* Sedgwick on Damages (8th Ed.) vol. 1, paragraph 379.

"If this logic is sound, then a corporation, in view of the general authorities previously cited, is responsible in punitive damages for the grossly negligent acts of a vice principal exercising the power and authority with which Pettijohn was clothed in this case. Aside from the logic of this conclusion, however, our Appellate Courts have held or stated that corporations are liable in exemplary damages for the punitive acts of their *vice principals.*"

The court there cites numerous authorities in support of the rules there restated and the case itself has since been many times cited with approval.

Assuming, however, that the issue of vice principal was not conclusively established as a matter of law but was a disputed issue of fact as contended by appellant, it must also be assumed, under the record and authorities cited in support thereof, that there exists an implied finding by the trial court to the effect that Martin was appellant's vice principal. In the case at bar appellees' cause of action for exemplary damages was an independent ground of recovery. After submitting the independent grounds for actual damages, the trial court then submitted five special issues on the independent grounds of exemplary damages. After the jury answered favorably all of the grounds for actual damages it likewise answered favorably all of the grounds submitted for exemplary damages. In doing so, it found that Martin instructed Ivie to install the stove without turning off the flow of the natural gas at the meter. It further found that the giving of such instructions by Martin was gross negligence and that the attempt of Ivie to connect the stove without cutting off the gas was also gross negligence, for which reasons it further allowed each appellee the sum of $2500 as exemplary damages in two separate issues. The issue of whether or not Martin was appellant's vice principal was a necessary issue to be established in order to sustain grounds of recovery for exemplary damages and appellant admits that such issue was raised by the evidence. Such issue was not submitted to the jury. Appellees as plaintiffs did not request its submission and appellant as defendant did not object to the failure of the trial court to submit it.

Under the provisions of Rule 279, Texas Rules of Civil Procedure, the right to have the jury pass upon the question of vice principal was waived by both parties, and, since there were no written findings of fact made by the trial court concerning the matter, the omitted issue of vice principal must be deemed as found by the trial court in such a manner as to support its judgment. The precise point here presented seems to have been determined adversely to appellant's contention here made in the case of Rodriguez v. Higginbotham-Bailey-Logan Co., Tex.Civ.App., 172 S.W. 2d 991, writ refused. In that case a component element of ground of recovery was the authority of an agent to make the contract in question. Such a question was not submitted to the jury. As here, the plaintiff did not request its issue of vice principal to be submitted to the jury and the defendant did not object to the failure of the trial court to submit the issue. The court there held that under such circumstances, the trial court should decide the issue in accordance with the evidence because its determination by a jury had been waived. In as much as all other grounds of recovery of exemplary damages were answered favorably by the jury, it must be concluded that there exists an implied finding of the trial court to the effect that Martin was the appellant's vice principal, there being ample evidence; if not conclusive evidence, in support thereof. This rule of law is likewise supported by the cases of Jordan v. Collier, Tex.Civ.App., 223 S.W.2d 544; Manzer v. Barnes, Tex.Civ.App., 237 S.W.2d 686; and Smith v. Henger, 148 Tex. 456, 226 S.W.2d 425, 20 A.L.R.2d 853.

A careful examination of the record reveals no reversible error. Appellant's points are all overruled and the judgment of the trial court is affirmed.

MARTIN, Justice (dissenting).

The majority opinion states, "It is admitted by all parties that the releases are

358

free of ambiguity." This opinion concurs as to such statement but respectfully dissents from the majority opinion for the following reasons. The releases copied in the majority opinion constitute a full release from liability and were required to be reformed or set aside upon proper pleading and proof of fraud, accident or mistake before a valid judgment could be awarded appellees against appellant. The further opinion is here expressed that the trial court permitted, over objection, improper testimony on the part of Mrs. Roden and that such testimony was of such prejudicial nature as to cause harm to appellant. These points will be discussed in their order.

Appellees seek to make much of the fact that appellant's attorneys did not know about the loan receipts discussed in the majority opinion at the time of the settlement and did not rely thereon. Nothing is said, however, concerning the fact that such loan receipts were actually delivered to appellant's attorneys as supporting data at the time of the delivery of the full releases as shown by the Statement of Facts on pages 195, 196, 198, 199 and 264. It is not assumed that appellees seriously contend that lack of knowledge on the part of appellant's attorneys as to the loan receipts or as to the fact appellant was delivered a full release can change the character of either of said written instruments. It also appears to be pertinent that the delivery of the full releases is supported by the production of the loan receipts showing full authorization from Manning and Roden to their agents to deliver such full releases to the appellant. Even under appellees' theory that the only requirement necessary to change a full release into a partial release is to show the intent of the parties, a theory refuted by all the authorities and the basis of this dissent, it would appear that the loan receipts giving authority to Manning and Roden's agents to execute a full settlement and release of their claims would shed light on even the intention of the parties at the time of the delivery of the full releases. At least such receipts evidence clearly that Manning and Roden's agents were given the authority to execute and deliver the full releases as delivered to appellant.

Appellees also make much of the use of the word or term "subrogation" as used in the preamble of the releases given appellant and their entire contention is that the releases were rendered partial releases merely by the use of the word "subrogation" in the preamble of the instruments and that they were entitled to introduce evidence that the releases as delivered did not express their intention.

The term "subrogation" in itself, or the use thereof in the releases, connotes absolutely nothing in so far as determining whether the releases given appellant are partial releases or full releases. This proposition is clearly sustained by an examination of the cause now before us. Appellant introduced pictures showing the front of Manning's duplex house. Such pictures showed the front wall and the front of the roof intact and also gave an excellent view down one side of the house. In the face of these revealing pictures of the house, appellees sought to nullify the impression given by the same by testimony that the entire back part of the house was burned out and destroyed leaving only the front wall standing. "It was just a hull back of the front." But, miraculously, Manning's furniture and personal property on one side of the duplex suffered no major damage and the Insurance Company paid this claim on the personal property and this suit contains no pleadings or claim as to any damage to Manning's personal property. It must, therefore, be assumed that Manning, at least, received a full and satisfactory insurance payment for his personal property and accepted the same as full payment of such damage. In fact, the record impels the thought that the $8,700 paid as insurance to Manning and Roden may have completely covered all damage suffered despite appellees' contentions to the contrary as to the items other than Manning's personal property. But, in this thought, had Manning and Roden accepted the $8,700 as their full damage, can any serious contention be made that the releases delivered under such circumstances by the Insurance Companies would have

differed in a single word or phrase from those actually delivered the appellant and here in issue. Nor can it be seriously contended that such releases would have been rendered partial releases merely by the use of the term "subrogation" therein.

But the issue will be brought directly in line with the explicit situation here existing under appellees' contention that the use of the term "subrogation" rendered the releases partial releases rather than full releases. When the appellant paid the sum of $8,000 to appellees' Insurance Companies, it was reimbursing them for the sum they paid Manning for his personal property as well as the other items of damage. It is an inescapable conclusion that as to Manning's personal property the subrogation claim appellant paid the Insurance Companies represented a full and final payment and that the releases given appellant in so far as they covered Manning's personal property were a full and final release. This is further affirmed by the fact that Manning makes no claim for this item of the damage in this suit. Therefore, we are faced in the cause itself with the unanswerable proposition that despite the use of the term "subrogation" as used in the preamble of the releases that the same were in truth and in fact a full and final release of Manning's claim for his personal property damage. "Subrogation claim" in itself may therefore connote a full settlement as conclusively as a partial settlement and such term is meaningless in itself in construing the releases in issue as partial releases rather than full releases as drawn.

Attention is further called to paragraph five of the releases as to this language, "has asserted a claim against Anderson Furniture Company *for payment of all loss and damage to said dwelling.*" (Emphasis added). This language, in the preamble of the releases, does not support the contention that the releases were merely for the Companys' subrogation claims respectively.

Since the term "subrogation" as used in the preamble of the releases is meaningless within itself in determining whether the releases are partial rather than full releases as drawn, the next step is to examine the specific terms of the releases. No discussion will be given on this phase of the releases as it is believed that the language of the releases is sufficient to clarify the issue, "Does hereby release the said Anderson Furniture Company of and from *any* and *all* claims, demands, causes of action, damages, suits or cost *whatever* by reason of said occurrence and *any and all resulting loss or damage to the dwelling owned by Emory E. Manning and wife, Mary Oleta Manning, on the date of said loss.*" (Emphasis added).

These releases, drawn by an attorney of many years experience in this field of law, were full releases and were required to be reformed or set aside before judgment could be granted appellees as against appellant. Under the conclusion arrived at in the above paragraphs that the releases were full releases and were required to be reformed, appellant's points 1, 3, 4, 6, 7 and 8 raise the issue on which this dissenting opinion is based, to wit: "It is too well settled to need citation of authorities that a court of equity, in the absence of fraud, accident, or mistake, cannot change the terms of a contract." Davis v. Davis, 141 Tex. 613, 175 S.W.2d 226, 230.

Appellees, Roden and Manning, in their pleadings only charge the two Insurance Companies and appellant with acting in collusion and in fraud to deprive them of their claims. There is not one line of pleading by such parties denying that the releases given appellant are full releases nor is there even any pleading by Roden and Manning that such releases did not evidence the intention of the parties thereto. Their pleadings in effect admit the giving of a full release. There is not one line of pleading that appellant exercised any fraud in procuring these full releases from the Insurance Companies that were acting as agents for Roden and Manning. Nor is there a scintilla of evidence in the record of any collusion between the Insurance Companies and appellant and no evidence of probative force as to fraud in this record. In fact, it may safely be stated that appellees Roden and Manning in the trial of the cause, abandoned their plea of collusion and fraud existing be-

tween appellant and their Insurance Companies. The issue stated herein is recognized by the fact that the trial court instructed a verdict for both Insurance Companies and for all like appellees in the cause and could have correctly instructed a verdict for appellant in so far as the element of fraud is concerned.

The case is utterly bare of any element of fraud and this is further admitted by the appellees taking no exception to the court's action in instructing a verdict for all the Insurance Companies. This finding leaves only the element of "accident and mistake" in issue. Although all the appellees shun the very thought of alleging that any mistake was made in the drawing, execution and delivery of the releases in both their pleadings and in their proof seeking reformation, this element will be discussed since "accident" is not an issue in the cause or even hinted at in either the pleading or the proof presented by any appellee.

"A mistake, in order to authorize the reformation of an instrument, should be pleaded clearly, specifically, with particularity, and with precision, and should be distinctly charged, the particular mistake being set forth, and how the mistake occurred, when the mistake occurred, and why it occurred." 76 C.J.S., Reformation of Instruments, § 74–b, page 437. In this connection it is asserted that a painstaking examination of the pleadings of Roden and Manning will not reveal a single line of pleading asserting that the full releases were given by either mistake or accident.

It is too elementary for citation of authority that a judgment must be based on both pleading and evidence.

In the sole thought of completeness in discussing the issue, a unique point is here observed and should be adjudicated by the courts. The rule is recognized that permits omissions in the pleadings of one party to be supplied by the pleadings of the opposite party. The rule has also gone so far as to permit omissions in one party's pleadings to be supplied by pleadings of other parties to the cause. But, the point here discussed is whether a party having wholly failed to plead a particular defense can rely upon pleadings of other parties

in the cause. Sound principle dictates that only "omissions" can be supplied by other pleadings in the cause and not pleadings in their entirety. To rule otherwise than here stated would permit a party to enter a lawsuit and without any pleadings recover on another party's petition or answer.

Although it is believed that we can go no further than supplying "omissions" in appellees' pleadings from other pleadings in the cause and that appellee cannot recover on the other appellees' pleadings in this cause without, at least, adopting same, Roden and Manning could have gained nothing even had they adopted the pleadings of the other appellees in their entirety as such pleadings likewise wholly fail to plead either accident or mistake. Let us briefly observe the pleadings of all other appellees on this point although they can, under the principle hereinabove discussed, avail Roden and Manning nothing.

It is recognized that the word "mistake" need not be used but certainly the pleadings must allege in some fashion that a mistake was made and how it was made and that thereby a full release was delivered appellant rather than a partial release. On behalf of brevity, paragraph XI of the pleadings of the Fireman's Fund Insurance Company best summarizes the pleadings of both Insurance Companies, and all appellees other than Manning and Roden, to wit: "XI. This defendant would show that if the release which it made and delivered to Anderson Furniture Company should be construed to constitute a release of any claim of the plaintiffs, Manning and wife, same did not evidence the intention of the parties and did not evidence the intention of this defendant, constituted a mistake in verbage which should be reformed in order that the true intent of a release of this defendant, of its claim against the Anderson Furniture Company on account of its said $5200.00 payment be carried into force and effect. Said release should be reformed to reach the true intent." (Emphasis added). It merely must be brought to mind that such pleadings were drawn by an attorney with years of experience in the field of insur-

ance law, as were the releases in issue likewise so drawn, and it is not believed that such attorney lacked the ability to allege clearly, specifically and with particularity the mistake and how it occurred, when the mistake occurred and why it occurred, if a mistake occurred, and if the parties sought to plead "mistake." "The allegations made in the petition as grounds for reformation amount to nothing more than an averment that the intention of the parties was different from that which the [releases] expressed. * * *" There is no pleading in the cause to serve as a basis for reformation. Davis v. Davis, supra.

Let us next concede there was proper pleading of accident and mistake for the purpose of examining the cause as to whether there is any evidence in the record to support such pleading. There is not a single word of testimony in the entire statement of facts alleging that a mistake was made in either the drawing, the execution, or in the delivery of the full releases. In fact, the evidence affirmatively supports the proposition that there was no mistake made in the drawing, execution and delivery of a full release. Even Manning and Roden's pleading develop this last proposition.

Only one person was qualified to testify on the element of mistake or accident in the drawing of the releases, J. Alex Blakeley. It is undisputed that he drew the releases out of the presence of the attorneys for appellant and without any information or suggestion from them. In fact, the record reveals that appellant's attorneys knew nothing of the full release until Blakeley apprised young attorney Bane of such fact. It is here conceded that Blakeley testified at length as to the "intent" of the parties but a careful examination of his testimony reveals that he not only does not admit by express words or statement that he erred or made a mistake or accidentally drew a full release instead of a partial release but there is not even an intimation that he made a mistake in drawing the releases in issue or that by accident he drew a full release instead of a partial release. The pleadings, as stated, "amount to nothing more than an averment that the inten-

tion of the parties was different from that which the deeds (releases) expressed and the parol evidence went no further. There was, therefore, neither pleading nor proof that could serve as the basis for reformation." Davis v. Davis, supra.

But, let us pursue further the allegation made hereinabove that Blakeley's testimony not only does not reveal any accident or mistake but goes even further and reveals that no accident or mistake occurred in the drawing, execution and delivery of the full releases. In this examination let us still bear in mind that Blakeley was an attorney experienced in the field of insurance law and attendant details. The astuteness of his ability is fully attested by the fact that he compromised and settled an insurance subrogation claim in the amount of $8,700 for the sum of $8,000 cash.

"Q. Is it, or not, a fact that you told Mr. Bane (young attorney for appellant) 'If you want to give these folks (meaning Roden and Manning) some trouble, why don't you plead those releases.'? A. I might have said something similar to that."

A further examination of his final statement on this phase of the testimony reveals:

"Q. Didn't you tell Lee Bane, 'If you want to give them some trouble, why don't you plead those releases'? A. I might have."

It should be further observed that the party who actually executed the releases for the Insurance Companies found no fault with them. No discussion of the above testimony is required as it is revealing enough in itself, but it is worthy of note that counsel for Fireman's Fund Insurance Company, recognizing the deadly potency of this admission, asked:

"Q. (By Mr. Coe) At the time you made the settlement, did you have in mind that it might give the plaintiff trouble?" (S. F. 269)

Although this question and the answer thereto were erroneously admitted over proper objection of appellant, it is also noted that Blakeley's answer was not re-

sponsive, as conceded by the trial court, in that he testified, *"We* did not anticipate \* \* \*." What *he* had in his mind and anticipated at the time is still unanswered, other than by the testimony in the paragraph above shown. This phase of the case impels attention to the fact that the entire statement of facts is filled with the secret thoughts, intentions, discussions of compromise and the beliefs of all appellees theoretically admitted as a basis for the setting aside of the written releases, which all parties concede are wholly unambiguous.

Summarizing to this point, it is submitted that an examination of all the pleadings in the cause as well as the evidence in the record reveals that the cause is clearly and concisely within the ruling of Davis v. Davis, supra, and the cause reflects error in granting judgment to Roden and Manning against the Anderson Furniture Company, there being neither sufficient pleadings nor evidence to reform or set aside the full release held by Anderson Furniture Company. Appellant's points 1, 3, 4, 6, 7 and 8 should have been sustained. Davis v. Davis, supra; Rogers v. Rogers, Tex.Com.App., 15 S.W.2d 1037.

A further ground for reversal of the judgment of the trial court is raised by appellant's points 10 and 11. Mrs. Homer Anderson Roden executed an instrument to her Insurance Company entitled "Loan Receipt." The fact that she was a married woman at the time will not be discussed here for this issue was not brought forward in the briefs nor is it material to the issue here discussed. The "Loan Receipt" appointed the Company "agent and attorney-in-fact with irrevocable power to collect any claim or claims, and to begin, prosecute, compromise or withdraw in his, its or their name, but at the expense of the said Company, any and all legal proceedings that the said Company may deem necessary to enforce such claim or claims, and to execute in the name of the undersigned, any documents that may be necessary to carry the same into effect for the purposes of this agreement." Following the above language was a short paragraph as fol-

lows: "Any legal proceedings are to be under the exclusive direction and control of said Company." This paragraph was stricken out by Mrs. Roden. Such loan receipt will not be discussed further than stating that it is a clear and unambiguous instrument and the act of Mrs. Roden in striking out the clause was one easily interpreted by the court from the written agreement itself and the line stricken therefrom.

The court permitted, over numerous and valid objections of the appellees, the following interrogation and response by Mrs. Roden in regard to the "Loan Receipt" and the line stricken therefrom:

"Q. (By Mr. Hauer) Was it not your intention in having an ink line drawn through that sentence to keep the Mercury Insurance Company from having exclusive control of the lawsuit which you had at the time this loan receipt was executed against Anderson Furniture Company? A. It was my intention that I was going to sue for the balance of it. And I did not intend for the Mercury Insurance Company to take any part—

"Q. I believe you said it was your intention to let the insurance company prosecute the claim for the insured loss and that you, yourself, would prosecute your claim for that amount over and above the $2,000 insurance which had been paid to you? A. It was my intention to let my attorneys act in behalf of collecting the balance that was due me over this $2000 when I marked through there. I wasn't giving Mercury Insurance Company authority to collect anything but the $2000."

Appellant saved his exception to the ruling of the trial court in admitting the above testimony and brings forward his points of error 10 and 11 asserting this testimony was improperly admitted over its objection. An examination of the entire cause discloses that all written instruments were discarded and the appellees allowed to testify over objections as to their secret intentions as to the subjects in such

written instruments and that the above testimony is an inflammatory and condensed presentation of the theory of the appellees as presented in the cause.

The instrument quoted above as to its material portions was one executed between appellee and her Insurance Company and is clear, concise and without any ambiguity and is subject only to interpretation by the trial court. The admission of this testimony, a summary of the appellees' theory presented over objection throughout the trial was particularly damaging to the appellant in that the pleadings of Roden and Manning allege that they had been defrauded of their claims by collusion and fraud practiced by their two Insurance Companies and the appellant. The objectionable testimony of Mrs. Roden was meant to, and it is believed did impress the jury that an inexperienced woman had been overreached by her own insurance company in the execution of the written "Loan Receipt" authorizing her insurance company to proceed with a full settlement. Appellant bore the entire brunt of the damaging effect of this testimony though not present at the time of the execution of this "Loan Receipt" or having any part in the creation of the issue on which Mrs. Roden testified. Manning by his pleadings sought $6,750 actual damage and the further sum of $2,500 exemplary damage. The jury awarded Manning $6,720 actual damage and $2,500 exemplary damage. The appellee, Roden, sought $6,281.32 actual damage and recovered $6,130.32 actual damage. He sought the further sum of $2,500 exemplary damage and recovered the sum of $2,500 exemplary damage. It is apparent that appellant was prejudiced by the testimony of Mrs. Roden in the light of the award by the jury of the item of $5,000 exemplary damage, alone.

The entire record was erroneously packed with this exact type of testimony admitted by the trial court over the proper objections of appellant under the appellees' theory that they could take the clear, unambiguous full releases and by the introduction of testimony merely as to their "intent" transform the full releases into partial releases and that without either pleading or proof of fraud, accident or mistake.

Appellees', Insurance Companies, motion for an instructed verdict as against appellees, Roden and Manning, on the basis that there was no evidence in the record of any fraud or collusion is well taken. Likewise well taken is their contention, asserted by trial amendment and also in their motions for instructed verdict against Manning and Roden, that the Insurance Companies in giving full releases to appellant did no more than they were expressly authorized to do by the written authority given them by Roden and Manning and that such parties were estopped to claim any damage arising thereby. Appellees', Insurance Companies, further motion for instructed verdict as against appellant based on the proposition that there was no pleading by appellant over and against the appellees, Insurance Companies, is also well taken. The correctness of the Companies' contentions is within the principles herein discussed and is recognized by the trial court's judgment and also by the fact that appellees, Roden and Manning, assign no error as to the instructed verdict given as against them.

This dissent is filed in the opinion that appellees' theory as adopted by the court in this cause violates the fundamental rules governing the rights of parties to contract in writing and that if such theory be finally recognized as a correct rule of law, will permit parties to execute their solemn written agreement and then reform the same by court decree merely by introduction of proof of their intention at the time the contract was executed and delivered—all without either pleading or proof of fraud, accident or mistake.

The cause should be reversed and the cause remanded as between appellees, Roden and Manning, and the appellant. The cause should be affirmed wherein the judgment denies all relief to both appellees, Roden and Manning, and to appellant as against the Fireman's Fund Insurance Company, Mercury Insurance Company and all appellees other than Roden and Manning.