### RYAN v. KENT.

No. 1226—5594.

Commission of Appeals of Texas, Section B.

April 1, 1931.

C. C. Gumm, of Fort Worth, for plaintiff in error.

Lawrence Treadwell, of Corsicana, and W. A. Tarver, of Austin, for defendant in error.

LEDDY, J.

We adopt the following statement of the case as made by the Court of Civil Appeals, 20 S.W.(2d) 1099:

"This suit was instituted by appellant, G. C. Kent, against appellee George R. Ryan, to cancel an oil and gas lease held by appellee on 106.5 acres of land, and to remove the cloud cast thereby on appellant's title to said land. Appellant further prayed that he be quieted in his title and possession of said land and the minerals therein and thereunder. Certain remote grantors in the chain of title under which appellee claimed said lease were also made parties defendant.

"J. C. Harper and wife, on May 14, 1919, executed and delivered to Paulsen-Highnote Oil & Gas Company an oil and gas lease on the tract of land involved in this suit. Said oil and gas company held at that time a prior oil and gas lease on said tract of land, and said Harper held the same subject thereto. Seven or eight shallow wells had theretofore been drilled on said land and oil discovered therein. Several or all of said wells were being operated at that time by said oil and gas company, and royalties on the oil produced therefrom were being paid to said Harper as they accrued. The average daily production of oil from said wells at that time is not shown, but at a later date the average production from each well operated is shown to have been 1 or 2 barrels per day. On said 14th day of May, 1919, a representative of said oil and gas company presented to said Harper and wife the mineral lease under which appellee now claims, and stated that said company needed a new lease to 'straighten their business out.' Harper testified that his attorney was out of town, and that he did not have an opportunity to advise with him about signing said lease. He further testified that nothing was said about drilling any further wells on said land; that he did not require any further wells to be drilled; and that said representative did not give any assurance or make any promise that other wells would be drilled. He did testify, however, that something was said at the time about 'deep oil.' There was testimony that a 'leasing campaign' was on in that territory at that time. Said lease, omitting immaterial paragraphs, is as follows:

"'Oil and Gas Lease—Form 88.

"'Agreement, Made and entered into the 14th day of May, 1919, by and between J. C. Harper and wife Mrs. Altie Harper, hereinafter called Lessor (whether one or more), and Paulson-Highnote Oil & Gas Co., hereinafter called Lessee:

"'Witnesseth: That the said Lessor for and in consideration of One Dollars, cash in hand paid, receipt of which is hereby acknowledged, and of the covenants and agreements hereinafter contained on the part of the lessee to be paid, kept and performed, have granted, demised, leased and let, and by these presents do grant, demise, lease and let unto the said Lessee for the sole and only purpose of mining and operating for oil and gas, and of laying pipe lines, and of building tanks, towers, stations and structure thereon to produce, save and take care of said products, all that certain tract of land situated in the County of Navarro, State of Texas, described as follows, to-wit: * * * (Field notes omitted.)

"' It is agreed that this lease shall remain in force for a term of five years from this

date, and as long thereafter as oil or gas, or either of them, is produced from said land by the lessee.

" 'In consideration of the premises, the said lessee covenants and agrees:

" '1st. To deliver to the credit of the Lessor, free of cost, in the pipe line to which he may connect ——— wells, the equal one-eighth part of all oil produced and saved from the leased premises.

" '2nd. To pay the Lessor one-eighth royalty, each year, in advance, for the gas from each well where gas only is found, while the same is being used off the premises, and the Lessor to have gas free of cost from any such well for ——— stoves and ——— inside lights in the principal dwelling house on said land during the same time by making their own connections with the well at their own risk and expense.

" '3rd. To pay Lessor for gas produced from any oil well and used off the premises at the rate of one-eighth royalty, per year, for the time during which such gas shall be used, said payments to be made each three months in advance. Also to pay Lessor one-eighth of the net proceeds derived from the sale of casing-head gas utilized in making gasoline.

" 'If no well be commenced on said land on or before the ——— day of ———, 191—, this lease shall terminate as to both parties, unless the Lessee on or before that date shall pay or tender to the Lessor, or to the Lessor's credit in the ——— Bank at ——— or its successors which shall continue as the depository regardless of all changes in the ownership of said land, the sum of ——— Dollars, which shall operate as a rental and cover the privileges of deferring the commencing of a well for ——— months from said date. In like manner and upon like payments, or tenders, the commencement of a well may be further deferred for like periods of the same number of months successively. And it is understood and agreed that the consideration first recited herein, the down payment, covers not only the privilege granted to the date when said first rental is payable, as aforesaid, but also the Lessee's option of extending that period as aforesaid, and any and all other rights conferred.

" 'Should the first well drilled on the above described land be a dry hole, then, and in that event, if a second well is not commenced on said land within twelve months from the expiration of the last rental period for which rental has been paid, this lease shall terminate as to both parties unless the Lessee on or before the expiration of said twelve months shall resume the payment of rentals in the same manner as hereinbefore provided. And it is agreed that upon the resumption of the payment of rentals as above provided, that the last preceding paragraph hereof, govern-ing the payment of rentals and the effect thereof, shall continue in force just as though there had been no interruption in the rental payments.

" 'If said Lessor owns a less interest in the above described land than the entire and undivided fee-simple estate therein, then the royalties and rentals herein provided for shall be paid the said Lessor only in the proportion which ——— interest bears to the whole and undivided fee.

" 'Lessee shall have the right to use, free of cost, oil and water produced on said land for ——— operations thereon, except water from wells of Lessor.

" 'When requested by Lessor, Lessee shall bury ——— pipe line below plow depth.

" 'No well shall be drilled nearer than 200 feet to the house or barn now on said premises, without the written consent of Lessor.

" 'Lessee shall have the right of ingress and egress to said premises at all times during the life of this lease.

" 'Lessee shall pay for all damages caused by operations to growing crops on said land.

" 'Lessee shall have the right at any time to remove all machinery and fixtures placed on said premises, including the right to draw and remove casing. * * * (Assignment and warranty clauses omitted.)

" 'In Testimony Whereof, we sign this the 14th day of May, A. D. 1919.

" 'J. C. Harper,
" 'Mrs. Altie Harper.'

"Appellee bases the claims asserted by him in this suit solely on said new lease. Said Paulsen-Highnote Oil & Gas Company continued to operate said shallow wells, paying the royalties accruing from such operation to the said Harper, until July 15, 1920, when it assigned said lease to another. Appellee claims under an assignment of said lease to him, dated December 13, 1924. Said assignment was the seventh successive assignment thereof. Said assignment to appellee was more than five years after the date of said lease.

"Harper and wife, on December 22, 1921, executed a deed of trust on said land to secure large sums of money owed by him to the First State Bank of Hillsboro. On January 11, 1923, they conveyed all the minerals in and under said land to said bank. There is testimony tending to show that this conveyance was intended as a mortgage to better secure said indebtedness. The trustee in said deed of trust, on September 4, 1925, sold said land to satisfy said indebtedness, and said bank became the purchaser at said sale and received a deed to said land from the trustee. Appellant purchased said land from said bank on February 18, 1927. He testified that the consideration for the sale of said land to

him was $9,000. He further testified that he bought said land in good faith, believing that said mineral lease had expired, and that he acquired by such purchase a fee-simple title to both the surface of the land and the minerals in and under the same. He further testified that the value of the land exclusive of minerals was $1,000, and that the value of the minerals in and under the same was estimated by him at the sum of $8,000 in such purchase.

"None of the successive holders of said lease ever drilled any well or wells to further develop the same and increase the production therefrom. Neither Harper nor said bank ever requested the drilling of such additional wells. During all said years the respective holders of said lease paid the stipulated royalties arising from the operation of said old wells to Harper or to said bank. Two such payments were made by appellee at the office of appellant after appellant purchased the land. Shortly after said lease was assigned to appellee he had a conversation with Harper with reference to the operation of said wells, and Harper stated to him that he was satisfied with the manner in which the same were being operated. Appellee testified that he told Harper at the time that he 'wanted to go ahead and put this lease in shape,' and that Harper said such action would be satisfactory to him. Appellee had a similar conversation with a representative of said bank. Shortly thereafter appellee expended about $2,700 in repairing and improving the machinery and appliances used in operating said wells. * * *

"The case was tried to the court and judgment rendered that appellant take nothing by his suit, and that appellee be quieted in his ownership, title, and possession of the mineral estate in and under said land, less a one-eighth royalty interest therein."

The Court of Civil Appeals reached the conclusion that there was a latent ambiguity in the provision of the lease which continued it in force, after the initial or fixed period of five years, "as long thereafter as oil or gas, or either of them, is produced from said land by the lessee." The case was reversed and remanded for a determination of the issue as to whether it was the intention of the parties to said instrument at the time of its execution that the continued operation of said old producing wells alone should constitute production of oil from the premises by lessee within the meaning of said provision, and thereby continue the rights of the lessee or his assigns therein so long as such production should be continued.

In ascertaining whether the parties to this contract intended that the lease should be continued by production from wells producing oil at the time it was executed, we may look to the surrounding circumstances when the contract was entered into, the situation of the parties, and of the subject-matter of the instrument (Lipscomb v. Fuqua, 103 Tex. 585, 131 S. W. 1061; Borden v. Patterson, 51 Tex. Civ. App. 173, 111 S. W. 182), and this regardless of whether the language used in said contract be ambiguous. Hoffer Oil Corp. v. Hughes (Tex. Civ. App.) 16 S.W.(2d) 901; Dublin v. Thompson (Tex. Civ. App.) 166 S. W. 113.

A clear statement of this rule is that made in Reed v. Insurance Co., 95 U. S. 23, 30, 24 L. Ed. 348, wherein the court said: "Although a written agreement cannot be varied (by addition or subtraction) by proof of circumstances out of which it grew and which surrounded its adoption, yet such circumstances are constantly resorted to for the purpose of ascertaining the subject-matter and the standpoint of the parties in relation thereto. Without some knowledge derived from such evidence, it would be impossible to comprehend the meaning of an instrument, or the effect to be given to the words of which it is composed. This preliminary knowledge is as indispensable as that of the language in which the instrument is written. A reference to the actual condition of things at the time, as they appeared to the parties themselves, is often necessary to prevent the court, in construing their language, from falling into mistakes and even absurdities. * * * 'It may, and indeed it often does, happen, that, in consequence of the surrounding circumstances being proved in evidence, the courts give to the instrument, thus relatively considered, an interpretation very different from what it would have received, had it been considered in the abstract. But this is only just and proper; since the effect of the evidence is not to vary the language employed, but merely to explain the sense in which the writer understood it.'"

Construing the contract in the light of these well-established principles, we think the provision for continuing the lease after the initial or fixed period of five years "as long * * * as oil or gas or either is produced from said land by the lessee" is not an ambiguous one. In plain terms it gives the lessee the right to continue to explore the land for oil so long as oil is produced by him from the premises, and this regardless of whether such oil should be produced from existing wells or from those subsequently drilled under the present lease.

It must be remembered the parties knew at the time they executed this lease that this very lessee was then producing oil in paying quantities from a number of wells which had been drilled on the premises under a prior lease. If it had been the intention of the parties that the last lease should not be continued after the five-year period, except by production of oil from wells drilled subse-

quent to its execution, it is altogether probable they would have used such restrictive language as would have limited the right of the lessee to continue the lease in force only by producing oil from wells other than those then in operation. The lease may be searched in vain for any such restrictive language. By the use of language too clear to be misunderstood the lease expressly gives the lessee the privilege of continuing it in force as long after five years as he produces oil or gas from the leased premises. It is undisputed that the lessee is now and has continuously been complying with the literal terms of the lease by producing oil from the premises and paying the required royalty thereon. Certainly the parties to this lease knew that oil produced from wells drilled under the prior lease would comply with the terms of this lease as it unquestionably would be oil "produced from said land by the lessee."

Even if it be conceded, however, that the provision in question is reasonably susceptible of two interpretations, the action of the trial court in refusing to decree a forfeiture of the lease was proper.

 Forfeitures are not favored at law and will only be decreed where the provision therefor is clear and specific. Waggoner Estate v. Sigler Oil Co., 118 Tex. 509, 19 S.W. (2d) 27, and authorities there cited. "The authority to forfeit a vested right or estate," says Judge Stayton, in Benavides v. Hunt, 79 Tex. 392, 15 S. W. 396, 399, "should not rest in provisions whose meaning is uncertain and obscure. It should be found only in language which is plain and clear—whose unequivocal character may render its exercise fair and rightful." Decker v. Kirlicks, 110 Tex. 94, 216 S. W. 385, 386.

This rule of construction is universally applied to oil leases. It must therefore be held that, if this contract is fairly susceptible of two interpretations, it should be so construed as to prevent a forfeiture of the rights granted thereunder. Adams v. Fidelity Lumber Co. (Tex. Civ. App.) 201 S. W. 1034; Decker v. Kirlicks, 110 Tex. 94, 216 S. W. 385, 386.

Nor will a liberal construction be given the provisions of the lease if to do so will cause a forfeiture of the rights secured thereby. South Texas Tel. Co. v. Huntington, 104 Tex. 350, 136 S. W. 1053, 138 S. W. 381.

It is manifest, we think, that the execution of the second lease was for the sole purpose of modifying the royalty provision contained therein. Under the first lease the lessee was required to pay a royalty of one-eighth of the oil produced from wells producing less than ten barrels per day, one-sixth from those producing between ten and fifteen barrels, and one-fourth on all wells producing in excess of

fifteen barrels per day. The new lease merely provided for the usual one-eighth royalty on all oil produced from the premises. This view is strongly reinforced by the fact that the parties left blank the usual clauses in the form 88 lease providing for a termination of the lease by failure of the lessee to drill or pay rentals during the five-year period.

We agree with the conclusion expressed by the Court of Civil Appeals that the lease under consideration, while it does not require, in express terms, the drilling of any additional wells, clearly does so by implication. Therefore the lessee rests under an obligation to develop said land with reasonable diligence for the production of oil and gas. As long, however, as he produces oil or gas in paying quantities from the leased premises, his rights are not subject to forfeiture. If he should fail to comply with the implied covenant to develop the land, the lessor's remedy would be an action to recover such damages as he may be able to show he has sustained by reason of the lessee's default. Texas Pacific Coal & Oil Co. v. Barker, 117 Tex. 418, 6 S.W.(2d) 1031, 1035, 60 A. L. R. 936; Freeport Sulphur Co. v. American Royalty Co., 117 Tex. 439, 6 S.W.(2d) 1039, 1045, 60 A. L. R. 890; Waggoner Estate v. Sigler Oil Co., supra.

We recommend the judgment of the Court of Civil Appeals be reversed and that of the trial court affirmed.

CURETON, C. J.

Judgment of the Court of Civil Appeals is reversed, and that of the district court affirmed, as recommended by the Commission of Appeals.