

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-08-00453-CV

VINSON MINERALS, LTD.,                                          APPELLANTS
JOHNNY H. VINSON AND
CHISHOLM 2000, L.P.

V.

XTO ENERGY, INC.                                               APPELLEE

------------

FROM THE 271ST DISTRICT COURT OF WISE COUNTY

------------

# OPINION

------------

## I. INTRODUCTION

Appellants Vinson Minerals, Ltd., Johnny H. Vinson, and Chisholm 2000, L.P. (the Vinsons) and Appellee XTO Energy, Inc. (XTO) filed cross-motions for summary judgment on the Vinsons' claims relating to ten oil and gas leases covering the Vinsons' ranch in Wise County, Texas. The trial court granted XTO's motion and denied the Vinsons' motion. The Vinsons, as one or more of the lessors in each of the leases, contend that they are entitled to terminate the leases with XTO, as

successor lessee, because XTO failed to make "undisputed payments" after demand. Because we hold that the Vinsons presented no evidence that they provided XTO with a proper written notice or demand for payment as required by the leases, we affirm.

## II. BACKGROUND

The oil and gas leases at issue originated in 2001 between Johnny Vinson, Vinson Minerals, Ltd., and others as lessors and Threshold Development Company as lessee. Threshold is a Vinson family company in that the owners, officers, and directors are members of the Vinson family. In 2003, Antero Resources Corporation bought Threshold's interests as lessee in the leases for $25 million.

In early 2005, the Vinsons began disputing Antero's calculations of royalty payments to the Vinsons from 2003 to 2005 and commenced an audit of Antero's accounting records of royalties. By letter of January 25, 2005, the Vinsons informed Antero that they were "waiting on requested information to complete [the] audit of production and royalty payments" and that the Vinsons' "potential claim" for royalty underpayment was $2 million. In March 2005, the Vinsons provided Antero with audit exceptions listing, among other complaints, improper deductions from royalty payments for compression, fuel, treating, and transportation charges by an

2

"affiliated" pipeline owned by Antero "to be determined" but "estimated . . . to be in the range of $600,000."[1]

The relationship between the parties deteriorated as the Vinsons raised other issues, including claims for reassignment of undeveloped acreage, drill site issues, and road and surface damage issues. On July 11, 2005, the Vinsons filed suit against Antero for numerous claims—including trespass, breach of contract, incorrect calculation and underpayment of royalties and other production costs, surface damages, and failure to develop—seeking an unspecified amount of damages and attorney fees.

In the meantime, two months before the Vinsons filed suit, XTO acquired Antero and the leases. XTO was made aware of the outstanding issues claimed by the Vinsons at the time it acquired the leases. In March 2005, the Vinsons faxed XTO a copy of its January 25 letter to Antero regarding the status of their claims. By letter dated August 5, 2005, XTO's outside litigation counsel initiated settlement dialogue with the Vinsons' counsel, requesting that the Vinsons (1) amend their pleadings to substitute XTO as the sole defendant, (2) agree to suspend their ongoing audit during litigation, and (3) consider opening discussions with XTO "to

---

[1] In his affidavit, Threshold's CFO stated, "Although I was unable to calculate a precise figure at that time because I had not received all documentation I had requested, I was able to arrive at the estimate within a matter of hours, and I noted it in the audit exceptions."

3

see if some or all of these issues can be resolved, and good working relations restored, before pursuing litigation aggressively."[2]

In a January 18, 2006 letter to the Vinsons' counsel, confirming delivery of documents in response to discovery, XTO's counsel reaffirmed its "intention to resolve the royalty payment issues both prospectively and [as] to past months, by an agreed method of changed payment and a lump sum settlement for past months once the new payment method is agreed upon." A few days later, XTO's and the Vinsons' accountants and legal counsel met to discuss settlement of all issues in the suit, including the issue of the new methodology to be agreed upon in order to recalculate the disputed royalties. Under the methodology proposed by XTO, its "estimated" preliminary calculation of royalty payments owed to the Vinsons for the period from November 2003 through April 2005 (the Antero period) totaled $643,548.19. XTO described this number as an estimate, subject to adjustment as XTO continued reviewing Antero's boxes of accounting records.[3] The Vinsons and

---

[2] ... In the letter, XTO observed that "relations between Antero and [the Vinsons] had deteriorated to a point that discussions for a reasonable resolution of some or all of the issues of the lawsuit became impossible."

[3] ... Following XTO's acquisition of Antero, XTO received 348 boxes of Antero records. To establish the $643,548.19 estimate, XTO "pieced together" information contained in 59 boxes from Antero labeled "accounting records." However, at the time of this estimate, XTO was finding numerous accounting records in the other 289 boxes. The document XTO provided to the Vinsons that contained its estimate was titled "Preliminary Accounting Review" and included the following notation: "These are preliminary findings only. All calculations are subject to further examination and revision by XTO Energy, Inc. Accounting personnel."

4

XTO agreed at this meeting to continue working, without the presence of legal counsel, on the changed methodology to recalculate the disputed royalty payments owed to the Vinsons during both the Antero period and the period after May 2005, when XTO acquired Antero (the XTO period). In this regard, the parties obtained a Rule 408 Agreed Protective Order from the trial court that included a provision for informal meetings of representatives of the parties to discuss royalty accounting issues.[4]

On March 16, 2006, XTO's counsel wrote the Vinsons' counsel, summarizing the current status of the ongoing settlement discussions on all issues and proposing that XTO recalculate all prior royalties under a revised methodology and format and "in due course, make a retroactive payment to bring all prior periods up to the new payment methodology." The letter requested that the Vinsons present a settlement demand "to resolve all issues in the case" as follows:

> Please discuss these issues with your client and present XTO a settlement demand to resolve all issues in the case. If we have misunderstood your pleading in any respect, or if you would need to discuss any of these issues prior to submitting a demand, please call me at your convenience.

---

[4] ... The last paragraph of the order, in part, states:

[The Vinsons] and [XTO] further agree that at certain times in this Lawsuit, it may be necessary for representatives of both [the Vinsons] and [XTO] to meet in person or via telephone, without counsel for either [the Vinsons] or [XTO] present, to discuss certain accounting issues raised in this Lawsuit. Such informal meetings . . . shall be governed by Texas Rule of Evidence 408.

On May 12, 2006, the Vinsons' counsel responded with a three-page letter faxed to XTO's counsel (the May 12 letter). The letter began with the following paragraph:

> In response to your March 16, 2006, letter regarding possible settlement of this matter, [the Vinsons have] been thoroughly engaged in reviewing all of the information available related to this dispute. Now that this review is complete [the Vinsons are] prepared to respond in full to your suggestion as to "what XTO might offer to attempt to resolve the rest of the claims in the lawsuit."

In the May 12 letter, the Vinsons' counsel characterized their claims as falling into two major categories, summarized as "surface/lessor issues" and "working interest/reassignment issues," with four main causes of action. He discussed those issues in detail, including the following:

> **Royalty/Accounting Issues.** If XTO makes a retroactive payment as represented, including interest and attorney fees, and revises the format for making future payments then this issue should be resolved. Until agreement on each of these matters is reached, in accordance with the terms of [the Vinson] leases . . . demand is hereby made for all undisputed payments due under the Wise County leases. As a part of any settlement of this issue XTO will also have to confirm that it will provide [the Vinsons] with daily production information . . . .

The letter concluded with the following paragraph:

> Considering each of these factors, [the Vinsons] conservatively believe[ ]this case has a value greatly in excess of $30,000,000. Recognizing the risks of litigation and the costs associated therewith, I have been authorized to settle all claims in exchange for a payment in the amount of $9,500,000 and XTO bringing itself into compliance with the Barnett Shale Project Agreement by signing JOA's correctly identifying Threshold's before and after payout working interests after XTO acquired Sinclair Oil Corporation's interest in said agreement, in the same manner as all previously executed JOA's.

6

On May 25, 2006, XTO paid the Vinsons the amount of $103,047.68, representing underpayments for royalties owed for the XTO period, and using the new methodology that had been discussed.[5] The Vinsons accepted that payment. XTO then began using the new methodology to adjust the royalty calculations previously made by Antero from the 348 boxes of accounting documents, which were incompatible with XTO's computer system, in order to calculate amounts to be paid for the Antero period.[6]

Sixty days after sending the May 12 letter, the Vinsons filed an amended petition substituting XTO as the defendant. In addition to the claims for damages previously asserted, the Vinsons alleged that XTO was in breach of contract by failing to make "undisputed royalty payments" demanded by the Vinsons in the May 12 letter. By the new pleading, the Vinsons added a request for a declaratory

---

[5] ... Joni Van Meter, XTO's accounting representative, explained in her September 2007 deposition that she was able to calculate applicable charges for gathering and transporting already in XTO's own computer system, to give them separate deduct codes, and to flag royalties for each individual owner as being exempt from those deductions.

[6] ... The Vinsons dispute that the "methodology" issue had anything to do with the amounts they claim for underpaid royalties but had to do with Antero's improper use of weighted averages and composite rates in calculating the royalties. According to the Vinsons, royalties were not being calculated on the higher of the proceeds from sale of the gas or the market value but simply on the amount realized, contrary to the leases, and XTO's proposal was to use an index price to simplify calculations. The Vinsons provide no record references to support this proposition but contend that the changed methodology would have no effect on the "undisputed amounts" at issue.

judgment seeking termination of the leases under the following portion of Section 3

(entitled "Royalty Payment") of the leases:[7]

> 3. **Royalty Payment.** Royalties on oil, gas, and other substances produced and saved hereunder shall be paid by [XTO] to [the Vinsons] as follows: . . .
>
> e. . . . If [XTO] wrongfully or unreasonably withholds any undisputed payment or payments due to [the Vinsons] for a period of sixty (60) days after written demand for payment is made by [the Vinsons] on [XTO at the above address (or such other address as may be specified in writing hereafter by XTO)], at the election of [the Vinsons] this lease may be terminated. The foregoing sentence shall not apply to payments withheld by [XTO] because [XTO] contests such payments in good faith so long as [XTO] has timely paid to lessor all undisputed payments due to [the Vinsons].[8]

On October 16, 2006, the Vinsons filed a partial motion for summary judgment

asking the trial court to declare the leases terminated under Section 3(e) of the

leases because of XTO's failure to comply with the Vinsons' alleged May 12 demand

that "all undisputed amounts" be paid within sixty days.[9]

---

[7] . . . The Vinsons' amended pleading attached a copy of the May 12 letter with all parts redacted except the single paragraph relied upon by the Vinsons as their demand for payment. Only when this amended pleading was filed did XTO's counsel learn of the Vinsons' interpretation of the May 12 letter as a "demand" that allegedly entitled them to termination of the leases.

[8] . . . The Vinsons omitted the last sentence of Section 3(e) of the leases in their amended petition and in their opening brief in this Court. Because we resolve this appeal on other grounds, we do not reach XTO's cross-point that the summary judgment may be upheld on the ground, raised in its motion for summary judgment and not addressed by the Vinsons on appeal, that the Vinsons produced no evidence that the payments were not contested by XTO in good faith.

[9] . . . The Vinsons sought partial summary judgment because other claims were pending at the time the motion was filed.

On November 1, 2006, XTO paid the Vinsons $725,942—the "estimated" amount of $643,548.19 in royalty underpayments during the Antero period for improper transportation charges on the Antero affiliated pipeline, plus $61,006 in interest and $21,387 in surface damages. XTO made subsequent payments of $16,972.79 and $2,380.82 to the Vinsons later in November 2006 as further adjustments for the underpaid amounts by Antero, as well as $150,000 in attorney's fees. After a hearing, the trial court denied the Vinsons' motion for partial summary judgment. Eventually, the parties settled all other claims and issues, with the Vinsons reserving their right to pursue the lease forfeiture claim.

XTO then filed a motion to exclude the May 12 letter under Texas Rule of Evidence 408, together with a motion for no-evidence summary judgment. XTO's no-evidence summary judgment motion asserted that the Vinsons had no evidence

> (1) that it fully and sufficiently described in writing the alleged breach or default and properly notified XTO of the forfeiture to result from said breach;
>
> (2) that undisputed royalty payments were due and owing under the Leases;
>
> (3) that undisputed payments were withheld in bad faith; and
>
> (4) that undisputed payments were wrongfully or unreasonably withheld.

The Vinsons responded to XTO's motion and also requested that the court reconsider their motion for partial summary judgment. The trial court granted XTO's motions to exclude and for summary judgment without specifying the grounds relied

9

on, denied the Vinsons' motion for reconsideration, and dismissed the Vinsons' case with prejudice. This appeal followed.

## III. ISSUES

On appeal, the Vinsons raise three issues. First, they contend that the trial court erred by denying their motion for summary judgment and granting XTO's motion for summary judgment because the Vinsons made written demand for payment of undisputed sums in the May 12 letter, XTO failed to pay those sums within sixty days, and the leases expressly provide that they may be terminated if "undisputed" sums are not paid within sixty days of written demand. Second, the Vinsons assert that the trial court abused its discretion by excluding from evidence the May 12 letter, which they contend was their "written demand" pursuant to the terms of the leases. Third, the Vinsons argue that the trial court erred by excusing XTO from complying with the leases and by applying the doctrine of disproportionate forfeiture.

XTO responds that the trial court correctly excluded the May 12 letter from evidence and that the trial court correctly granted its summary judgment motion because the Vinsons produced no evidence of a proper demand, no evidence that unpaid royalties were "undisputed," no evidence that amounts claimed were "wrongfully or unreasonably" withheld, and no evidence that the Vinsons gave proper notice "fully describing" any breach or default by XTO as required by the leases for

10

forfeiture. XTO further asserts that the Vinsons were made whole by the payments they accepted, which foreclosed any election to sue for forfeiture of the leases.

## IV. ANALYSIS

At the core of the Vinsons' appeal is their complaint that the trial court abused its discretion by excluding from evidence and refusing to consider the May 12 letter, which the Vinsons characterize as their "Demand Letter." The Vinsons contend that the May 12 letter was admissible and was a proper written demand that met the requirements of Section 3(e) of the leases. We will first consider whether the trial court abused its discretion by excluding the May 12 letter from evidence.

## A. The May 12 Letter Was Not a "Demand Letter."

The Vinsons argue that the trial court abused its discretion by excluding the May 12 letter from evidence under Texas Rule of Evidence 408 as a compromise offer because the letter was not a compromise settlement demand but was clearly a "Demand Letter" notifying XTO of its obligation to pay an amount that XTO knew it owed but was withholding until all issues could be resolved. The Vinsons point out that the letter contained wording from Section 3(e) of the leases making "demand . . . for all undisputed payments due" and that it expressly referred to the Wise County leases, which was, according to the Vinsons, sufficient language to put XTO on notice that the leases gave it sixty days to respond in order to defeat forfeiture of the leases. Thus, the Vinsons argue that the letter was admissible as evidence of a demand. XTO replies that the language of the letter is couched as a global

11

settlement demand offering to compromise all issues in the case for a total specific amount (the only amount demanded in the letter); that the amount owed for royalties was disputed; that if the Vinsons intended a demand for payment in the letter, it was not recognized as such by XTO's forty-year veteran oil and gas litigation attorney; and that the alleged demand was misleading and surreptitious with no specified amount to cure a default and did not specify a time within which to pay but, instead, indicated it would remain open until settlement. Thus, XTO argues the May 12 letter was properly excluded by the trial court.

Offers of settlement are not admissible to prove liability or invalidity of a claim or its amount. Tex. R. Evid. 408; *Ford Motor Co. v. Leggat*, 904 S.W.2d 643, 649 (Tex. 1995) (orig. proceeding); *Tatum v. Progressive Polymers, Inc.*, 881 S.W.2d 835, 837 (Tex. App.—Tyler 1994, no writ). In an offer of settlement or compromise, a party concedes some right to which he believes he is entitled in order to bring about a mutual settlement. *Mercedes-Benz of N. Am. v. Dickenson*, 720 S.W.2d 844, 857 (Tex. App.—Fort Worth 1986, no writ). But rule 408 does not bar the admission of settlement offers when offered for another relevant purpose. Tex. R. Evid. 408; *Barrett v. U. S. Brass Corp.*, 864 S.W.2d 606, 633 (Tex. App.—Houston [1st Dist.] 1993), *rev'd on other grounds sub nom*, *Amstadt v. U. S. Brass Corp.*, 919 S.W.2d 644 (1996). Thus, an offer or demand for settlement may be admissible for another purpose, such as to demonstrate bias or prejudice. Tex. R. Evid. 408; *Gen. Motors Corp. v. Saenz*, 829 S.W.2d 230, 243 (Tex. App.—Corpus Christi 1991),

*rev'd on other grounds*, 873 S.W.2d 353 (Tex. 1993); *C & H Nationwide, Inc. v. Thompson*, 810 S.W.2d 259, 269 (Tex. App.—Houston [1st Dist.] 1991), *rev'd on other grounds*, 903 S.W.2d 315 (Tex. 1994); *Ochs v. Martinez*, 789 S.W.2d 949, 959–60 (Tex. App.—San Antonio 1990, writ denied) (op. on reh'g).

The burden is on the party objecting to evidence under rule 408 to show that it was a part of settlement negotiations and not offered for another purpose. *TCA Bldg. Co. v. Nw. Res. Co.*, 922 S.W.2d 629, 636 (Tex. App.—Waco 1996, writ denied); *Haney v. Purcell Co., Inc.*, 796 S.W.2d 782, 790 (Tex. App.—Houston [1st Dist.] 1990, writ denied). Whether the evidence is being impermissibly offered as evidence of liability or for some other valid reason is a matter within the trial court's discretion. *Tatum*, 881 S.W.2d at 837. Only when the trial court abuses its discretion will its ruling be disturbed on appeal.[10] *See id.*

XTO contends that, when the "demand" language is properly viewed in the context of the remainder of the May 12 letter and the parties' ongoing negotiations, the letter was clearly a part of settlement negotiations, not a demand for payment of undisputed amounts triggering forfeiture of the leases if not paid.[11] XTO points out

---

[10] ... The abuse of discretion standard of review is limited to the trial court's determination to exclude the May 12 letter from evidence. We review the trial court's summary judgment ruling de novo. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009).

[11] ... As late as October 2007, the Vinsons represented to the trial court in a "Memorandum of Settlement," filed in response to an order of the trial court prior to a scheduling conference, that the "bulk of the parties' settlement discussions to date have focused on [the Vinsons'] royalty claims."

13

that the May 12 letter's first paragraph begins: "*In response to your March 16, 2006, letter regarding possible settlement of this matter*, . . . ." [Emphasis added.] Moreover, the very paragraph of the letter the Vinsons rely upon as setting forth the demand begins by expressly acknowledging, immediately before the words they claim to be a demand for payment, that a settlement had *not* been reached, stating: "*Until agreement on each of these matters is reached* . . . ." [Emphasis added.] Immediately following the demand language, that same paragraph references payment of such undisputed amounts as a part of a proposed settlement, stating that "*[A]s a part of any settlement of this issue,* XTO will also have to confirm" that it will provide various production information in a timely manner. [Emphasis added.]

Then, as XTO notes, the letter closes with a straightforward compromise settlement demand for the entire case, stating that the Vinsons value the case at more than $30 million, but "[r]ecognizing the risks of litigation and the costs associated therewith, *I have been authorized to settle all claims* in exchange for a payment in the amount of $9,500,000." [Emphasis added.] The Vinsons deny that the last paragraph of the letter was intended to constitute a settlement demand for all claims—including their claim for unpaid royalties— and insist that the letter made clear that the Vinsons' counsel was only authorized to settle all *other* matters for a specified amount. We disagree with the Vinsons' post hoc interpretation. "All claims" necessarily includes the Vinsons' claim for unpaid royalties, which were sought in the pending litigation.

The May 12 letter speaks for itself.  It begins with a discussion of settlement, states that it is in response to XTO's request for a settlement demand, clearly and unambiguously concludes with a settlement demand for "all claims," and was written during the parties' ongoing negotiations for settlement of an existing lawsuit that included the Vinsons' claim for underpayment of royalties.  The May 12 letter also concludes by conceding a right to which the Vinsons believe they are entitled.  *See Mercedes-Benz*, 720 S.W.2d at 857 (holding that an offer of compromise exists when a party concedes some right to which he believes he is entitled to bring about a mutual settlement).  Specifically, the letter concludes with a valuation of "this case" greatly in excess of $30 million and an offer to settle "all claims" for $9.5 million.  The language and context of the letter negate any reasonable interpretation of the language buried in the middle of a sentence, buried in the middle of a paragraph, and buried in the middle of the three-page letter as a stand-alone "demand" for payment under Section 3(e) of the leases that can be considered separate and apart from the rest of the letter.

The purpose of rule 408 is to encourage settlement.  *See MG Bldg. Materials, Ltd. v. Moses Lopez Custom Homes, Inc.*, 179 S.W.3d 51, 61 (Tex. App.—San Antonio 2005, pet. denied); *State Farm Mut. Auto Ins. Co. v. Wilborn*, 835 S.W.2d 260, 261 (Tex. App.—Houston [14th Dist.] 1992, orig. proceeding) (noting settlement offers are excluded to allow a party to "buy his peace and encourage settlement of claims outside the courthouse").  Permitting a party to recharacterize, after the fact,

15

what was clearly a settlement demand as a "Demand Letter," to use the Vinsons' label, based upon part of a sentence inserted in the middle of a letter otherwise ostensibly devoted from beginning to end to compromise and settlement, in order to invoke the harsh consequences of forfeiture, would reward obfuscation and "gotcha" tactics and would chill rather than encourage parties to negotiate in good faith toward a compromise and settlement of their claims.

By granting XTO's motion to exclude, the trial court could have found, within its discretion, that the May 12 letter was not a "demand letter" sufficient to trigger a forfeiture under the terms of the leases but was part of a settlement demand inadmissible under rule 408 offered solely to prove XTO's liability for forfeiture of its leases. *Cf. Mercedes-Benz*, 720 S.W.2d at 857 (holding trial court was within its discretion to determine a letter "was more in the nature of an ultimatum than an offer to compromise" and, therefore, admissible into evidence). We will not disturb the exercise of the trial court's discretion in excluding the May 12 letter from the summary judgment evidence. *See id.*; *Allen v. Avery*, 537 S.W.2d 789, 791 (Tex. App.—Texarkana 1976, no writ) (upholding trial court's exclusion of compromise settlement from evidence). We overrule the Vinsons' second issue.

**B.    Insufficient Evidence Existed to Raise an Issue of Fact as to Notice and Demand to Entitle the Vinsons to Forfeiture of the Leases.**

The Vinsons contend in their first issue that the trial court erred by denying their motion for summary judgment and granting XTO's motion for summary judgment because the May 12 letter constituted written demand for payment, XTO

16

failed to pay those sums within sixty days, and the leases expressly provide that they may be terminated if "undisputed" sums are not paid within sixty days of written demand. But even if the trial court erred by excluding the May 12 letter from evidence as a demand, the Vinsons were only entitled to damages, not forfeiture of the leases. Thus, the Vinsons have failed to show how the exclusion of the May 12 letter led to rendition of an improper judgment. *See* Tex. R. App. P. 44.1(a).

The promise to pay royalties is generally a covenant,[12] which will give rise only to a remedy of damages in absence of a specific clause allowing the option of termination of the lease upon the lessee's failure to pay. *Blackmon*, 276 S.W.3d at 606 (citing Linton E. Barbee, *The Lessor's Remedies for Nonpayment of Royalty*, 45 Tex. L. Rev. 132, 159 (1966)). As XTO acknowledges, the Vinson leases are among the "few" that contain a specific clause making non-payment of royalties a condition subsequent, expressly permitting the Vinsons, as lessors, to elect to seek forfeiture of the lease. *See* Barbee, 45 Tex. L. Rev. at 159–60.

Upon breach of a condition subsequent, the lessor must elect between seeking damages or forfeiture; the lease is not automatically terminated upon breach. *Blackmon*, 276 S.W.3d at 605; *see Chicago, T. & M.C. Ry Co. v. Titterington*, 84 Tex. 218, 223–24, 19 S.W. 472, 474 (1892). The lessor must take

---

[12] ... There are three primary qualifications generally imposed on the various ownership interests created by an oil and gas lease: (1) general and special limitations, (2) conditions subsequent, and (3) covenants. A.W. Walker, Jr., *The Nature of the Property Interests Created by an Oil and Gas Lease in Texas,* 8 Tex. L. Rev. 483, 483–84 (1930); *see Blackmon v. XTO Energy, Inc.,* 276 S.W.3d 600, 605 (Tex. App.—Waco 2009, no pet.).

17

affirmative steps by re-entering or seeking a judicial declaration of forfeiture as the Vinsons did in this case. *See* Barbee, 45 Tex. L. Rev. at 159.

The rule of strict construction disfavoring forfeiture applies when a forfeiture is claimed for breach of a condition subsequent. *Coastal Oil & Gas Corp. v. Roberts*, 28 S.W.3d 759, 763 (Tex. App.—Corpus Christi 2000, pet. granted, judgm't vacated w.r.m.); *Tickner v. Luse*, 220 S.W. 578, 589 (Tex. Civ. App.—El Paso 1920, writ ref'd); *see* Patrick H. Martin & Bruce M. Kramer, 3 Williams & Meyers, Oil and Gas Law § 656.2 (2008) (stating that strict construction "governs forfeiture provisions based on failure to make proper and timely payment of royalty"). It is settled law that the rule of construction against the right of forfeiture applies to oil and gas leases. *Wisdom v. Minchen*, 154 S.W.2d 330, 334 (Tex. Civ. App.—Galveston 1941, writ ref'd w.o.m.) (citing *Ryan v. Kent*, 36 S.W.2d 1007, 1011 (Tex. Comm'n App. 1931, judgm't adopted)). Thus, if the lease contract is susceptible of two reasonable interpretations, it should be construed as to prevent a forfeiture. *Ryan*, 36 S.W.2d at 1011; *Wisdom*, 154 S.W.2d at 334.

Additionally, if the lease contains a provision giving the lessee a right of notice of any breach or default before declaring any forfeiture, it must be "literally complied with." *Coastal*, 28 S.W.3d at 763 (citing *Deace v. Stribling*, 142 S.W.2d 564, 566 (Tex. Civ. App.—Austin 1940, no writ). Under such a provision, the lessor cannot claim a forfeiture without giving the lessee the benefit of notice of any default and an opportunity to remedy it. *Wisdom*, 154 S.W.2d at 334.

18

The Vinsons contend that this case is controlled by *Coastal Oil & Gas Corp. v. Roberts*, in which a global demand referencing no stated amount of royalties due, and not mentioning termination, was nevertheless held sufficient to entitle the lessor to forfeiture of a lease under a provision that, according to the Vinsons, is almost identical to Section 3(e) of their leases. *See* 28 S.W.3d at 764–65. We agree that *Coastal* is similar to this case but find it distinguishable in material respects.

Paragraph 3 of the *Coastal* leases, specifically regarding royalties and other payments for production, and similar to section 3(e) of the Vinsons' leases, provided:

> Royalties and other payments for production shall be due and owing to Lessor within 120 days from the date of first production . . . . If Lessee wrongfully or unreasonably withholds any such payment or payments due to Lessor for a period of thirty (30) days after written demand for payment is made by Lessor on Lessee at the above address (or other such address as made by [sic] specified in writing hereafter by Lessee), at the election of Lessor this lease may be terminated.

*Id.* at 761–62.

Litigation had been pending by the lessor against Coastal for several years for underpaid royalties on several other leases, but not for the "E" or "F" lease. *See id.* at 761. Coastal, as lessee, failed to pay any royalties due on the F-6 well on its "F" lease by the 120th day after first production of gas from the well it drilled on that property. *See id.* at 762. Coastal suspended payment of any royalties due on the F-6 well while it awaited return of a signed division order from the lessor. *See id.* Without returning the division order, the lessor sent a written demand letter that read, in toto, as follows:

19

Plaintiffs hereby make demand for all royalties due and owing pursuant to each paragraph 3 of the (a.) Coates "E" lease and (b.) Coates "F" lease. Plaintiffs demand payment in full from each separate defendant, their proportionate share of all amounts due. You have thirty (30) days, after receipt of this letter, to pay said amounts. We appreciate your immediate attention to this matter.

*Id.* The lessor subsequently amended its pleadings in the existing suit and sought to terminate the lease based upon Coastal's "wrongful or unreasonable" failure to pay royalties after written demand for payment. *See id.* Coastal contended that the lessor failed to give proper notice because the generic written demand letter did not explain the amounts owed, how Coastal had improperly calculated royalties, or how the lessor wished royalties to be calculated, and was thus "insufficient, deliberately vague and written in such a way as to keep [Coastal] from being able to adequately respond." *Id.* The Corpus Christi Court of Appeals affirmed a summary judgment for the lessor, holding that the written demand sufficed to invoke the right of the lessor to terminate, despite the rule that oil and gas leases must be construed against forfeiture,[13] and despite the additional rule that the prerequisites of notice of forfeiture must be "literally complied with"[14] because the Coastal lease did not require the lessor to explain the particulars of the breach or to specify how the

---

[13] *See id.* at 763 (citing *Cambridge Oil Co. v. Huggins*, 765 S.W.2d 540, 542–43 (Tex. App.—Corpus Christi 1989, writ denied); *see also Reilly v. Rangers Mgmt. Inc.*, 727 S.W.2d 527, 530 (Tex. 1987); *TSB Exco, Inc. v. E.N. Smith, III Energy Corp.*, 818 S.W.2d 417, 422 (Tex. App.—Texarkana 1991, no writ).

[14] *Coastal*, 28 S.W.3d at 763; *see Deace*, 142 S.W.2d at 566 (holding that suit brought twenty-five days after notice to lessee could not be maintained where lease required thirty days notice because authorities hold "prerequisite of notice to forfeit contained in a lease must be literally complied with").

lessee had defaulted and, thus, the lessor's global demand did "literally compl[y]" with the requirement of written demand for payment. *Id.* at 763–65. *Coastal* differs significantly from this case. First, the demand in *Coastal* was clearly a "written demand" as required by the lease, unlike the alleged demand here, which was contained within a letter offering to settle the pending litigation. *See id.* at 762. Coastal clearly recognized the demand as such because it responded and complained that the demand letter was inadequate. *See id.* Most significantly, the Corpus Christi court's holding in *Coastal* that the lessor "literally complied" with the forfeiture clause rests upon the absence of any language in that lease requiring the lessor to describe the breach or specify the particulars of the default. *See id.* at 764. Holding that "literal compliance" with the prerequisite of notice to forfeit did not require the lessor to identify the specifics of the breach, the court of appeals noted in a footnote:

> An example of a clause in a lease requiring the lessor to indicate the specifics of the breach is found in 4 HOWARD R. WILLIAMS & CHARLES J. MEYERS, OIL & GAS LAW § 682.1, at 340 (1984) (citing *Ridl v. E.P. Operating Limited Partnership*, 553 N.W.2d 784 (N.D. 1996)). The clause provides, in relevant part, "In the event the Lessor considers that Lessee has failed to comply with an obligation hereunder, express or implied, Lessor shall *notify Lessee in writing specifying in what respect Lessor claims Lessee has breached this lease . . . .*

*Id.* at 764 n.3.

The leases in this case, unlike the one in *Coastal*, do contain such a clause as the example cited in the footnote, requiring the Vinsons, as lessors, to provide

21

written notice "fully describing the breach or default" to entitle them to forfeiture of the leases. Section 11 of the leases, applicable to all breaches or defaults, states:

> No litigation shall be initiated by [the Vinsons] for damages, forfeiture, or cancellation with respect to any breach or default by [XTO] hereunder, for a period of at least sixty (60) days after [the Vinsons] ha[ve] given [XTO] written notice *fully describing the breach or default*, and then only if [XTO] fails to remedy the breach or default within such period. [Emphasis added.]

The lease in *Coastal* contained no such provision, and the court refused to write into the contract a requirement that it did not provide. *Id.* at 764–65. *Compare Ridl*, 553 N.W.2d at 784 (lessor's demands not "specifying in wShat respects" lessee breached lease, as required by notice clause, not appropriate demand entitling lessor to forfeiture), *and Savoy v. Tidewater Oil Co.*, 218 F. Supp. 607, 610 (W.D. La. 1963) (notice required lessor to "point out the particulars in which they were deemed deficient" to allow forfeiture), *aff'd*, 326 F.2d 757 (5th Cir. 1964), *and Mont. E. Pipe Line Co. v. Shell Oil Co.*, 216 F. Supp. 214, 221 (D. Mont. 1963) (notice should "express clearly the dereliction of which complaint is made"), *with Sowell v. Natural Gas Pipeline Co. of Am.*, 789 F.2d 1151, 1156 (5th Cir. 1986) (applying Texas law) (notice and demand clause contained no condition requiring specific facts of breach but demand letter identified proper royalty as based upon six-county average gas price specified in division order).

The Vinsons did not comply with Section 11's notice provision requiring them to "fully describe" the breach or default. They offered no answer to the prerequisites of notice and cure under Section 11 of the leases in their opening brief except to

22

assert that Sections 11 and 3(e) involve "different circumstances." For the first time in their reply brief, they argue that they repeatedly made their complaints known in writing in their audit exceptions provided to XTO as early as March 2005, and more than 60 days expired before they brought suit. But none of those communications specified any amount due or gave XTO a time within which to cure the alleged default. For example, the Vinsons' audit exception with respect to the improper transportation charges stated only that "the Dollar amount . . . to be determined but is estimated . . . to be in the range of $600,000." And none of their communications claimed any amount to be "undisputed."[15] Thus, even if the language in the May 12 letter was intended to constitute notice, it was for an unspecified amount to be paid by an unspecified time for unspecified claims or charges, as to all of which XTO was left to guess. Where forfeiture of a lease is dependent on the making of a demand for performance, the demand must be proper, specific, and reasonable. *Outdoor Sys., Inc. v. BBE, L.L.C.*, 105 S.W.3d 66, 71 (Tex. App.—Eastland 2003, pet. denied) (holding that a lessor's demand letter was excessive, unreasonable, and

---

[15] During oral argument, the parties vehemently disputed the meaning of the term "undisputed" contained in Section 3(e) of the leases. XTO contended that both parties must have agreed on an amount for it to be "undisputed," whereas the Vinsons argued that only XTO could know whether it disputed the amount owed. To the extent that both interpretations may be reasonable, we must adopt the construction that avoids forfeiture. *Coastal*, 28 S.W.3d at 763; *Wisdom*, 154 S.W.2d at 334. We conclude that the term "undisputed" as used in Section 3(e) of the leases requires a specific amount to be undisputed by both parties, which was never the case here.

imprecise when it demanded payment within ten days of an unspecified amount based upon "total arrearages from the inception of the Leases").

The Vinsons' May 12 letter states neither a time limit within which XTO is to make the payments nor notice of any amount other than the $9.5 million proposed for settlement of all claims. *See id.* Moreover, the Vinsons have never identified any amount that was "undisputed" either in the trial court or in this court. The Vinsons acknowledge as much in their reply brief in this court, conceding that they "could not know what was undisputed by XTO; thus, [they] could not demand a specific amount." If the Vinsons could not know the amount they were demanding to be paid by XTO, it is difficult to see how they can argue that XTO had notice of what amount was "undisputed."

The Vinsons' solution to this conundrum is to argue that "[e]ven if XTO was uncertain as to exactly how much money it owed, it clearly knew (from the parties' prior dealings and discussions) that it owed [the Vinsons] in excess of $600,000; accordingly, it had a duty to tender the portion that was undisputed." The Vinsons also quote from the September 25, 2006 deposition of XTO's accounting representative, in which she stated that upon recalculating the monies due to the Vinsons, she came up with an amount "in the neighborhood of $650,000 to $700,000," that she estimated the amount owed for the Antero period for transportation charges was $643,548.19, and that she agreed with the Vinsons' counsel's estimate that XTO recognized since at least January of 2006 that it owed "something north of $600,000" for past due royalty. The Vinsons cite no authority

24

defining "undisputed" to include an "estimated" amount, nor do we agree that "in the neighborhood of" or "something north of" a particular amount equates to an "undisputed amount."

The May 12 letter is insufficiently specific to constitute "written notice fully describing the breach or default" as required by Section 11 of the leases, particularly in the context of the remainder of the letter and the ongoing negotiations for settlement. *See id.*; *see also Cedar Rapids Television Co. v. MCC Iowa LLC*, 560 F.3d 734, 739–40 (8th Cir. 2009) (holding notice of termination of a contract must be "clear and unequivocal" and state a definite intent to cancel or terminate the contract); *Laverty v. Hawkeye Sec. Ins. Co.*, 140 N.W.2d 83, 87 (Iowa 1966); *Morris Silverman Mgmt. Co. v. W. Union Fin. Serv., Inc.*, 284 F. Supp. 2d 964, 974 (N.D. Ill. 2003) (citing *LA-Nev. Transit Co. v. Marathon Oil Co.*, 985 F.2d 797, 800 (5th Cir. 1993) ("The focus is on whether the notice is sufficiently clear to apprise the other party of the action being taken.")); *see also Accu-Weather, Inc. v. Prospect Comm. Inc.*, 644 A.2d 1251, 1254 (Pa. Super. Ct. 1994) (holding conditions precedent to termination must be strictly complied with, and clear and unequivocal language is necessary to terminate); *Morris Silverman*, 284 F. Supp. 2d at 974 ("[T]o be effective, notice of termination must be 'clear and unequivocal.'"); *Todd v. Corp. Life Ins. Co.,* No. 89-C-7711, 1990 WL 16430, at *4 (N.D. Ill. Feb. 15, 1990), *aff'd in part, rev'd on other grounds*, 945 F.2d 204, 208 (7th Cir. 1991) ("[N]otice to terminate a contract under an express provision must be clear and unequivocal.").

25

The May 12 letter also fails to give XTO notice that the Vinsons intended to seek the drastic remedy of forfeiture of the leases if payment was not made within any certain time. Specifically, written notice seeking to invoke the harsh remedy of termination or forfeiture must be clear and unambiguous. *See Ogden v. Gibraltar Sav. Ass'n*, 640 S.W.2d 232, 233–34 (Tex. 1982) (holding that equity demands clear and unequivocal notice be given of a party's intent to exercise such harsh consequences as acceleration or foreclosure); *see also Shumway v. Horizon Credit Corp.*, 801 S.W.2d 890, 891–92 (Tex. 1991) (holding harshness of option of accelerating maturity of extended indebtedness requires both strict reading of terms of option and notice to debtor, and notice of intent and notice of acceleration must be clear and unambiguous); *Outdoor Sys., Inc.*, 105 S.W.3d at 71 ("The cases in this State hold that a landlord cannot forfeit the lease of his tenant for failure to comply with the provisions without first making demand upon the tenant for performance."); Barbee, 45 Tex. L. Rev. at 161 (stating terms of a claim for forfeiture of an oil and gas lease must be clear and unambiguous and lessor is held to strict proof of compliance with notice and demand requirements).

The Vinsons argue that the reference in the letter to the Wise County leases and the words "undisputed payments" and "demand" were sufficient to alert XTO that the Vinsons were seeking to invoke Section 3(e) of the leases, which allowed an election for forfeiture. Even if the letter was sufficient to invoke Section 3(e) as a demand for payment, it was not sufficient for them to invoke termination under

26

Section 11. The May 12 letter was written in the context of settlement negotiations for numerous claims for alleged breaches of covenants and conditions. At best, an analogy may be made to cases under the Uniform Commercial Code, where attempted notices of termination of a contract—"mixed" with words of negotiation and compromise—have been held ineffective as a matter of law. *See, e.g.*, *Stovall v. Pub. Paper Co.,* 584 P.2d 1375, 1380 (Or. 1978) (holding notice of termination insufficient where it mixed words of termination with words of compromise, negotiation, and present obligation); *Morris Silverman*, 284 F. Supp. 2d at 974 (holding notice of termination ineffective where party made repeated oral and written statements that it intended to continue contract); *Gatt Trading Co. v. Sears, Roebuck, & Co.,* No. 02-CV-1573-B, 2004 WL 2511894, at *10 (N.D. Tex. Nov. 8, 2004) (holding letter attempting to terminate insufficient where it invited further negotiation); *Accu-Weather*, 644 A.2d at 1254 (holding notice of termination that made reference to continuing contract to later date held "ineffectively ambiguous"); *cf. Dresser Indus., Inc. v. Pyrrhus AG*, 936 F.2d 921, 930 (7th Cir. 1991) (holding notice clearly invoking termination clause that also indicated willingness to negotiate sufficient where notice also stated further discussions would not limit effect of termination notice).

Because we have determined that the trial court did not abuse its discretion by excluding the May 12 letter from evidence, and because we conclude that the May 12 letter was also insufficient as a matter of law to constitute a proper written

notice fully describing the breach or default in order for the Vinsons to seek forfeiture, we hold that the May 12 letter is no evidence that the Vinsons provided XTO with a proper "written demand" for payment or notice of default as required by the leases, entitling them to a declaratory judgment forfeiting the leases.

Alternatively, the Vinsons argue that they made a sufficient demand by filing their amended petition and attaching the May 12 letter with all three pages of text redacted except the few words in the middle of the letter that they contend is a demand. However, by precluding initiation of litigation until notice has been provided, the lease agreements effectively prevent the use of a pleading to make a demand. Moreover, the Vinsons did not make a "demand" by their amended pleading. Rather, they used XTO's alleged failure to pay within sixty days after May 12, 2006, as the reason to assert their election to terminate.

As previously discussed, Section 11 of the leases precluded the Vinsons from "initiat[ing] litigation" unless XTO had received "written notice fully describing the breach or default" and had "fail[ed] to remedy the breach or default within" sixty days of receiving the notice. Because suit could not be filed until XTO had at least sixty days after notice in which to remedy the breach or default, the letter's attachment to the Vinsons' amended petition could not serve as the required notice of default. *See Deace*, 142 S.W.2d at 566 (holding prerequisite of thirty days' written notice to cancel or terminate lease prior to filing of suit not literally complied with and, therefore, ineffective where suit was brought twenty-five days after notice); *see also*

28

*Westwind Exploration Inc. v. Homestate Sav. Ass'n*, 696 S.W.2d 378, 382 (Tex. 1985) (holding that contracting parties intend every clause to have some effect); *Lacquement v. Handy*, 876 S.W.2d 932, 937 (Tex. App.—Fort Worth 1994, no writ) (stating that language in contracts is given its plain, ordinary meaning).

Moreover, we do not agree that attaching the redacted letter to XTO's amended petition was sufficient to meet the leases' pre-suit notification requirement. *See Huff v. Fid. Union Life Ins. Co.*, 158 Tex. 433, 443, 312 S.W.2d 493, 500 (1958) (holding that neither the filing of a lawsuit "arising out of a contract nor the allegation of a demand in the pleadings constitutes presentment of a demand" to entitle a party to attorney fees as required by Chapter 38 of the Texas Civil Practice and Remedies Code); *see also Richardson v. Foster & Sear, L.L.P.*, 257 S.W.3d 782, 785 (Tex. App.—Fort Worth 2008, no pet.) (stating that the filing of a lawsuit does not constitute the sixty-day pre-suit notice of a Deceptive Trade Practices Act claim as required by section 17.505(a) of the business and commerce code).

Absent proper notice under Section 11 of the leases, the Vinsons are not entitled to forfeiture of the leases, even if the May 12 letter constituted a proper "written demand" for payment. Finding no evidence that the Vinsons provided XTO legally sufficient written notice or demand for payment of undisputed sums as required by the terms of the leases, we hold that the trial court correctly granted XTO's no-evidence motion for summary judgment. For the same reasons, we hold that the Vinsons failed to establish entitlement to a traditional summary judgment

29

declaring the leases forfeited for XTO's failure to pay undisputed amounts within sixty days of a written demand. We overrule the Vinsons' first issue.[16]

## V. CONCLUSION

Having overruled the Vinsons' first and second issues and having found it unnecessary to address the Vinsons' third issue, we affirm the trial court's judgment.

ANNE GARDNER
JUSTICE

PANEL: LIVINGSTON, C.J.; GARDNER and WALKER, JJ.

LIVINGSTON, C.J. filed a concurring opinion.

DELIVERED: December 16, 2010

---

[16]... Because the summary judgment in favor of XTO may be upheld based upon no evidence of a sufficient demand, we need not consider the Vinsons' third issue as to whether the trial court erred by excusing XTO's compliance and by applying the doctrine of disproportionate forfeiture, nor need we consider XTO's alternative grounds raised in the trial court to sustain its summary judgment based on no evidence that it "wrongfully or unreasonably" withheld undisputed payments or did not act in "good faith" in contesting such payments under Section 3(e). *See* Tex. R. App. P. 47.1.



# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

---

### NO. 02-08-00453-CV

---

VINSON MINERALS, LTD.,                                            APPELLANTS
JOHNNY H. VINSON AND
CHISHOLM 2000, L.P.

V.

XTO ENERGY, INC.                                                    APPELLEE

------------

FROM THE 271ST DISTRICT COURT OF WISE COUNTY

------------

## CONCURRING OPINION

----------

I respectfully concur with the majority opinion and write separately only to make some distinctions regarding the rule 408 admissibility question raised by the Vinsons' May 12, 2006 "demand" letter and the sufficiency of their "election of forfeiture." *See* Tex. R. Evid. 408.

Texas Rule of Evidence 408 mandates exclusion of evidence of settlement offers unless offered for some reason other than to establish liability. *Id.* Additionally, the burden is on the *objecting* party to show that the evidence was not

offered for some other reason or purpose allowed by rule 408. *See In re Univar USA, Inc.*, 311 S.W.3d 175, 182 (Tex. App.—Beaumont 2010, orig. proceeding). And courts have recognized the admission of some portions of settlement agreements if relevant for proof of some other element than liability. *Id.*

Because the letter was written in response to XTO's request to provide such a "settlement demand," the Vinson demand letter must be read in context with that preceding request. Basically, XTO asks, "What will it take to settle all the various other/remaining claims [other than the accounting/royalty issues] asserted in the Vinsons' latest pleading?" In other words, XTO's letter implies that it believes they have basically resolved the accounting/royalty issues. And apparently, the May 12, 2006 Vinson letter acknowledges this: "[T]his issue should be resolved." However, that belief is clearly contingent upon XTO's performance in accordance with the representations it had made to the Vinsons regarding the accounting/royalty issues. Furthermore, the Vinsons follow this statement with a clear demand for "all undisputed payments due under the Wise County leases." As the Vinsons point out, XTO admits that it has calculated and is ready to pay undisputed amounts, amounts that necessarily can only be fully determined by XTO. Thus, I believe that this portion of the May 12, 2006 letter is a demand for payment of undisputed amounts, not evidence of a settlement offer, and that the trial court abused its discretion in excluding this portion of the Vinsons' response under rule 408. This portion of the

letter was admissible because it was offered for "another purpose than validity of the claim." Tex. R. Evid. 408.

As to the forfeiture issue, we are to construe oil and gas leases disfavoring forfeiture. *See Coastal Oil & Gas Corp. v. Roberts*, 28 S.W.3d 759, 763 (Tex. App.—Corpus Christi 2000, pet. dism'd by agr.). If a lease states how to give notice of demand or forfeiture, such notice must comport with the lease. *Id.* at 764.

Here, the remaining question is whether this portion of the letter is a sufficient demand and whether it made clear that failure to perform within a certain time would result in the Vinsons exercising their forfeiture rights. I would agree with the majority as to the insufficiency of the forfeiture. The accounting/royalty demand portion gave no notice of a time limit within which to perform, which the lease states can be no less than sixty days with prior written notice. Furthermore, and more importantly, the last paragraph of the letter, which would have also had to have been admitted, includes the value of the entire "case" and is an offer to settle "all claims." Again, there is no notice or mention of the possibility of forfeiture. And as XTO points out, the last paragraph refutes the claim of forfeiture because the Vinsons offered to settle *all* aspects of the case for a sum certain. Thus, I believe, and would conclude, that the letter, although admissible in part, provided insufficient notice of what performance was required and when and insufficient notice that the failure to timely perform would result in the exercise of the election to forfeit the leases.

3

Because my analysis would result in the same affirmance of the trial court's granting of XTO's motion for summary judgment, I join in the judgment of the court and concur only to set forth these distinctions.

TERRIE LIVINGSTON
CHIEF JUSTICE

DELIVERED: December 16, 2010

4